### 30587. GOODWIN v. THE STATE.

HILL, Justice.

This is a death case. The defendant, Terry Lee Goodwin, was indicted by the Walton County grand jury for the offenses of murder and armed robbery occurring on April 9, 1975. Following his plea of not guilty, he was tried by jury, found guilty in a general verdict and sentenced to death. The jury found as aggravating circumstances warranting the imposition of the death penalty that the murder was committed while the defendant was engaged in the commission of another capital felony. The case is here for review of enumerated errors and of the sentence of death.

The state presented evidence from which the jury was authorized to find the following facts: The victim, Brad Studdard, 17 years old, worked at the Snack and Rack Recreation Parlor and owned a 1969 Buick Skylark. Two weeks before the murder, defendant told Ed Mitchell,

"I oughta kill somebody and take their car." The defendant mentioned this matter to Mitchell on two later occasions. Sometime prior to the slaying, defendant was with Clinton Foster and took out a butcher knife and showed Foster how to use it . That knife was similar to the murder weapon. Defendant asked Foster if he would help rob a "boy at the poolroom."

On Wednesday, April 9, 1975, the victim left home at about 6:50 p.m. and drove to work at the poolroom. Later that same evening, about 10 p.m., the defendant entered the Snack and Rack Recreation Parlor and played several games of pool with the victim.

When they left the poolroom, they went in the victim's car to a convenience food store where the defendant bought a six pack of beer. As they drove around, they talked, drank beer, and according to the defendant, smoked marijuana. After they finished the beer, the victim stopped the car near Good Hope Road in order to urinate. The defendant also got out of the car, pulled the butcher knife out of his pocket, and demanded the automobile.

When the victim refused, the defendant marched the victim into the woods and again demanded the car. When the victim attempted to flee, the defendant chased and caught him. With the victim on the ground, the defendant began stabbing him. After being stabbed several times the victim begged not to be stabbed anymore, but the defendant continued to stab him a total of about 18 times.

The defendant threw the butcher knife across the road and drove away in the victim's car. He abandoned the automobile not far from his house but he removed the victim's alarm clock and senior key from the car.

Upon waking the next morning, Thursday, the victim's father learned that his son had not come home and began looking for him. Late that afternoon the abandoned car was found. On Friday, April 11, 1975, defendant phoned the victim's home and, without identifying himself, asked if there were any news and whether any reward had been offered. He was told that money could be raised for information concerning the boy's whereabouts. Later that same day defendant

phoned again and asked if the reward had been raised. Claiming to be "John Smith," defendant said he had heard something about Good Hope Road.

On that same day, a disc jockey at a local radio station received several calls from a man claiming to be "John Smith" who said that it would be advisable to look for the missing boy near Good Hope Road.

Acting on a tip from a woman who overheard defendant admitting to a murder, a deputy sheriff went to the defendant's house late Friday and brought him to the police station shortly after midnight. The defendant was advised of his rights and thereafter he admitted being the person who had called the victim's home on two occasions since the disappearance. On Saturday morning, April 12, 1975, the defendant was again advised of his constitutional rights and he signed a waiver. Defendant said that a friend had told him Brad's body was near Good Hope Road and he thought he could find about where it was. Defendant went with the officers to the Good Hope Road location. After the body was found, the defendant was returned to jail while the scene was investigated. The officers found a shoe tassle that had come from the defendant's shoe.

On Saturday afternoon, the officers secured a search warrant and searched the defendant's house. They found a blood-stained corduroy coat with the victim's alarm clock and senior key in a pocket. The keys to the victim's car were found under a rug.

Saturday evening the officers again advised defendant of his constitutional rights and obtained a signed waiver. When confronted with the physical evidence against him, defendant confessed to the murder and robbery. On Sunday, April 13, officers found the murder knife across the road as the defendant's confession had indicated.

The defense presented the testimony of a school psychometrist who had administered an intelligence test to the defendant which showed he had an IQ of 58 and his mental age was 9 years, 6 months whereas he was in fact 18 years old.

Thereafter the state presented two doctors who testified that the defendant was examined at Central

State Hospital over a period of 82 days. One psychiatrist testified that defendant had an IQ of 81, only three or four points below normal, and no serious psychiatric problems, although defendant was diagnosed as being on the border line of mental retardation. In the opinion of the other doctor at the same hospital the defendant displayed no evidence of psychosis.

The jury returned a general verdict of guilty and thereafter fixed the punishment of death.

1. In his first enumeration of error, defendant urges that the court erred in admitting into evidence his alleged confession for the reason that, due to mental retardation, he was incapable of understanding and effectively waiving his rights against self-incrimination.

The defendant was advised of his constitutional rights in connection with these crimes each time before he gave any statement and had been so advised three times before he confessed. The evidence that his statements and confession were voluntary is uncontradicted by competent evidence.

Following a Jackson-Denno hearing, Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), the court admitted the confession into evidence. To admit a confession in evidence, the trial court must determine from the preponderance of the evidence that the confession was freely and voluntarily given, after being advised in accordance with Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1965). Lego v. Twomey, 404 U. S. 477 (92 SC 619, 30 LE2d 618) (1972); *High v. State,* 233 Ga. 153, 154 (210 SE2d 673) (1974); *Johnson v. State,* 233 Ga. 58 (209 SE2d 629) (1974).

Here, however, the defendant urges that he was mentally incapable of understanding and waiving his right against self incrimination. However, judged by the foregoing standards, we find that the evidence supports the trial judge's ruling upon this issue.

The decisions relied upon by defendant are inapplicable. In Haley v. Ohio, 332 U. S. 596 (68 SC 302, 92 LE 224) (1947), the defendant, a 15-year-old boy, was questioned by 5 or 6 police officers in relays of 2 officers continuously for 5 hours until he confessed. There was some indication that he had been beaten while in custody

and he was held incommunicado for the three days after his confession while his lawyer attempted to see him.

In Reck v. Pate, 367 U. S. 433 (81 SC 1541, 6 LE2d 948) (1961) the defendant, a 19-year-old retarded youth without prior criminal record was in custody of the police for a week, during which time he was frequently ill, fainted several times, vomited blood on the floor of the police station, and was twice taken to the hospital on a stretcher. During that week he was questioned incessantly, seldom fed, had no formal charge placed against him and was confined practically incommunicado. On the contrary, this defendant had a prior criminal record, was fed when the deputies ate, was not ill, and there is no suggestion of brutality except that the psychiatrist testified that the defendant told him that he was beaten and confessed because he was afraid.

In Gallegos v. Colorado, 370 U. S. 49 (82 SC 1209, 8 LE2d 325) (1961), the defendant was a 14-year-old boy. The crucial evidence introduced at the trial was a formal confession which he had signed after he had been held for five days without seeing a lawyer, parent or other friendly adult, although his mother had attempted to see him.

In the case before us the trial court found the confession to be admissible and that finding was not erroneous. *High v. State,* supra; *Johnson v. State,* supra.

2. In his second enumeration of error the defendant asserts that, regarding the charge of armed robbery, the verdict and sentence are contrary to law and to the evidence.

Defendant's confession, heretofore found to be admissible, and the other evidence in the case were sufficient to authorize the jury to find that the defendant planned to take the victim's car, that he asked the victim for the use of the car, that he stabbed the victim when the use of the car was refused, and that the defendant then took the car. The defendant's argument that this was just a case of two young men joy riding and drinking beer and smoking marijuana was not accepted by the jury.

The evidence was sufficient to authorize a conviction of armed robbery. However, as will be discussed below, the jury returned a general verdict.

3. In his third enumeration of error, defendant

alleges that the court erred in permitting the district attorney to state to the jury, in closing argument on the guilt-innocence phase of the trial and not correcting him, that "If you find that he did not commit the armed robbery, you cannot find him guilty of murder." Defendant correctly urges that this is an incorrect statement of the law.

However, no objection to this misstatement was made at trial and it is easy to understand why. The district attorney in effect was saying that the state must prove the defendant guilty beyond a reasonable doubt of both armed robbery and murder in order for the jury to find that the defendant was guilty of murder. This made the burden on the state more difficult than the law requires and thereby served to benefit the defendant.

Moreover, the defendant did not receive a separate sentence on the charge of armed robbery, as will be discussed below. Although we find no merit in this enumeration of error, this aspect of the case will be considered in connection with our review of the death sentence.

4. The constitutionality of the death penalty in Georgia was upheld in *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974), and decisions following *Coley.*

5. *Sentence Review.* —In our sentence review we have considered the evidence concerning the crimes of murder and armed robbery and the aggravating circumstances found by the jury, to wit: that the murder was committed while the defendant was engaged in the commission of another capital felony.

Our review has included the fact that the jury returned a general verdict of guilty. That is to say, although the trial court charged the jury in the guilt-innocence phase of trial that the defendant was charged with two crimes, murder and armed robbery, and that the jury could find the defendant guilty or not guilty of both or either of those crimes, the jury returned a verdict as follows: "We the jury find the defendant guilty." This general verdict was returned pursuant to the court's instruction: "Now if you believe the State has proven the guilt of the defendant beyond a reasonable doubt on all counts of this indictment, then the form of your verdict, in

that event, would be, 'We, the Jury, find the defendant guilty.' "

A general verdict of guilty returned upon a two-count indictment charging separate offenses means that the accused was found guilty upon both counts. *Grace v. State,* 36 Ga. App. 190(2) (136 SE 107) (1926); *Cronin v. State,* 13 Ga. App. 652 (2) (79 SE 747) (1913); *Tooke v. State,* 4 Ga. App. 495 (3) (61 SE 917) (1908).

Under the law and under the charge of the court in this case, the jury found the defendant guilty of both murder and armed robbery. Following the return of the general verdict of guilty, the jury heard argument and instruction as to sentencing and returned the following verdict: "We fix his punishment as death. The offense of murder was committed while the offender was engaged in the commission of another capital felony."

It is clear that the jury found the defendant guilty of both murder and armed robbery, as they were authorized to do by the evidence in this case, although no separate sentence as such was imposed upon the armed robbery conviction.

We have reviewed the death sentence as required by Ga. L. 1973, p. 159 et seq. (Code Ann. § 27-2537(c)), as was done in *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974), and each subsequent case involving the death penalty under this statute. We conclude that the sentence of death imposed here was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The evidence supports the jury's finding of a statutory aggravating circumstance; i.e., that the offense of murder was committed while the offender was engaged in another capital felony, to wit: armed robbery. Code Ann. § 27-2534.1 (b) (2).

We have compared the evidence and sentence in this case with similar cases contained in the appendix attached to this opinion. All the cases selected for comparison were for murders committed in the course of another felony occurring at a time when the death penalty was authorized. The cases reveal that it is not unusual for juries in Georgia to impose the death penalty when murder is committed in the course of another felony where the victim of that felony is murdered. Although it may

appear that the crimes committed were unnecessary, it does not render punishment therefor unnecessary. Terry Lee Goodwin's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

*Judgment affirmed. All the Justices concur, except Gunter, and Jordan, JJ., who dissent.*

ARGUED JANUARY 13, 1976 — DECIDED FEBRUARY 24, 1976.

*H. P. Austin, Jr., Michael R. Jones,* for appellant.
*John T. Strauss, District Attorney, Arthur K. Bolton, Attorney General, Harrison Kohler,* for appellee.

## Appendix.

Similar cases considered by the court: *Lingo v. State,* 226 Ga. 496 (175 SE2d 657) (1970); *Johnson v. State,* 226 Ga. 511 (175 SE2d 840) (1970); *Pass v. State,* 227 Ga. 730 (182 SE2d 779) (1971); *Kramer v. State,* 230 Ga. 855 (199 SE2d 805) (1973); *Hunter v. State,* 231 Ga. 494 (202 SE2d 441) (1973); *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1975); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975); *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975).

JORDAN, Justice, dissenting.

I dissent to the imposition of the death penalty in this case due to the evidence concerning the mental capacity of the defendant, and for no other reason.