43207. ROMINE v. THE STATE.
(350 SE2d 446)

CLARKE, Presiding Justice.

This is the second appearance of this death penalty case. Previously, this court affirmed appellant's conviction on two counts of murder, but reversed the death sentences on the ground that appellant's presentation of potentially mitigating evidence was improperly restricted. See *Romine v. State,* 251 Ga. 208 (305 SE2d 93) (1983). The facts are set forth in our previous opinion. Stated briefly, appellant, Larry Romine, a former gospel singer and occasional preacher whose descent into a life of drugs and adultery met with severe parental disapproval and opposition, entered his parents' home one day while they were at work, waited for their return, and then killed them both with a .16 gauge shotgun.

After a retrial on the question of sentence, Romine has again been sentenced to death. We now affirm.[1]

1. In his first two enumerations of error, Romine argues that the trial court erred by directing the jury to continue its deliberations after the jury had communicated to the court "in clear and unambiguous language" that it was "hopelessly deadlocked," and further erred by subsequently giving the jury a so-called "Allen" charge. See *Allen v. United States,* 164 U. S. 492 (17 SC 154, 41 LE 528) (1896).

For reasons which follow, we conclude that the trial court did not abuse its discretion by directing further deliberations, and that, inasmuch as the charge subsequently given by the court contained none of the aspects for which *Allen* charges have been so often — and justifiably — criticized, it was not improper.

(a) We begin our analysis with an exposition of the relevant his-

---

[1] The jury returned its verdict as to sentence on August 29, 1985. The completed trial transcript was filed in the superior court on December 16, 1985, and the case was docketed in this court on January 2, 1986. However, when it was learned that appellant's trial attorney had suffered a heart attack shortly after the completion of the trial, the case was stricken from the docket of this court and remanded to the trial court for a determination of whether new or additional counsel should be appointed to represent appellant on appeal. After a hearing, the trial court ruled on February 12, 1986, that the trial attorney, J. Roger Thompson, had continued to work on the appeal since the remand, and that he was physically capable of proceeding, particularly if additional counsel was appointed to assume a share of the workload. Attorney Thomas Lenzer was appointed to assist Thompson with appellant's representation, and the case was re-docketed in this court on February 18, 1986. The case was orally argued on April 22, 1986.

torical facts of the trial proceeding. The presentation of evidence began (after a lengthy voir dire session) on August 21, 1985. Closing arguments and the charge of the court concluded seven days later and the jury began its deliberations at 2:50 p.m. on August 28.

At 6:15 p.m., the court asked the jury if it was making any progress in its deliberations and if it would like to break for dinner at that time. The foreman answered, "We have a pretty wide division on it right now and the consensus of most everybody here is —" The court interrupted to ask the foreman not to tell "about your division of it," and the foreman continued, "I'm not. It's that they don't believe they can make a decision on it, about it."

The court sent the jury to dinner, with instructions to return at 7:30 p.m., stating, "That'll give you an hour and fifteen minutes. Then I'll let you all deliberate a while longer tonight. If you're not able to reach a verdict, then I'll, we'll talk about it later."

Shortly after 10:00 p.m., the court asked the jury if it had been able to make any progress since supper. The foreman answered, "some." The court asked whether the jury would like to continue their deliberations that evening, or to come back in the morning. The foreman answered, "I don't think staying here any longer tonight will change anyone's mind one way or the other." The trial court then recessed for the evening.

Deliberations resumed at 9:00 a.m. the next day. At 9:15, the court received a note from the foreman stating, "We are unable to reach a unanimous decision and are certain we will not ever be able to reach one."

At 10:00 a.m., the court discussed the note with the jury, in open court, as follows:

"The Court: Mr. Foreman, I have a note here that you had sent concerning your deliberations so far. Without telling me which way and what it is, can you just give me the numerical breakdown of how you stand? That's the only thing, just a numerical breakdown.

"The Foreman: Eleven to one.

"The Court: Eleven to one?

"The Foreman: Yes, sir.

"The Court: Uh, foreman, you all have only been deliberating about six and a half, seven hours and I would like you all to consider continuing your deliberations. See what you can do with it. I'm not putting any pressure on you one way or the other. Whatever your decision is, that's your decision, but I feel like you need to deliberate on it longer.

"The Foreman: Well, the six or seven hours is what we've been together. But everybody has thought about it in their own mind for, since 3:00 yesterday. I believe some people thought about it in their own minds very seriously last night.

"The Court: Well, still, uh . . . I'm gonna leave you together for a while longer and see what you can do, sir."

Appellant made a motion for a mistrial, on the ground that the jury was deadlocked. The motion was denied.

At 11:00 a.m., the jury asked the court to give a re-charge on mitigating circumstances, and that was done.

At 3:30 p.m., after determining that the jury had not yet reached a verdict, the court gave the following instructions to the jury:

"Let me give you some other instructions at this time. You have now been deliberating upon this case for a considerable period of time. The court deems it proper to advise you further in regards to the desirability of agreement if possible.

"The case has been exhaustively and carefully tried by both sides and has been submitted to you for decision and verdict if possible.

"While the verdict must be the conclusion of each juror and not a mere acquiescence of the jurors in order to reach an agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with proper regard and deference to the opinions of each other. A proper regard for the judgments of others will greatly aid us in forming our own judgments.

"Each juror should listen to the arguments of other jurors. If the members of the jury differ in their views of the evidence or the mitigating or aggravating circumstances, such differences of opinion should cause them all to scrutinize the evidence more closely and to re-examine the grounds of their opinion. It's your duty to decide the issues which have been submitted to you if you can conscientiously do so.

"Do not hesitate to change an opinion if convinced it is wrong. However, you should never surrender honest conviction or opinions in order to be congenial or to reach a verdict solely because of the opinions of other jurors.

"The aim ever to be kept in view is the truth as it appears from the evidence, examined in the light of the instructions of the court. Now upon our exit, you may again continue your deliberations for a reasonable period of time and examine your differences in a spirit of fairness and candor and try to arrive at a verdict in this case.

"I believe you've been going since lunch, haven't you? Since you came back from lunch?

"Why don't at this time we let you walk about, get you a Coke or a drink of water, use the restrooms and then come back in and let you start from the very beginning and see if there's any possibility of a verdict."

Appellant's objection to the charge was overruled, and his motion for mistrial was denied.

At 5:30 p.m., the jury informed the court that it had reached a

verdict. The parties were assembled and the jury's verdict of death on both counts of murder was published at 6:00 p.m.

(b) Romine refers us to three death penalty cases from the states of Florida and Delaware involving deadlocked juries and *Allen* charges. See *Patten v. State,* 467 S2d 975 (Fla. 1985); *Rush v. State,* 491 A2d 439 (Del. Supr. 1985); and *Rose v. State,* 425 S2d 521 (Fla. 1983).

Delaware law makes no provision for a verdict of life; the jury is simply asked whether it unanimously recommends a death sentence. In *Rush v. State,* supra, the jury told the trial court that it was unable to reach a unanimous verdict and wished to know what to do about the verdict form. The Delaware Supreme Court held that the trial judge should have limited his response to the second paragraph of his supplemental instructions, viz: "Unlike an ordinary verdict where there must be unanimous agreement by all twelve jurors one way or the other, that is, guilty or not guilty, question 2 simply asks, 'Does the jury unanimously recommend that a sentence of death be imposed?' If there is not unanimous agreement to recommend a sentence of death, the answer to that question must be 'no.'"

Under Delaware law, when a jury decides that it cannot agree on a unanimous verdict of death, it has reached a verdict, and the trial court must accept it. Any instructions to deliberate further in an attempt to reach a unanimous verdict implicitly encourage the jury to reach a verdict of death, in view of the form of the verdict presented to a Delaware jury.

Romine points out that, in Georgia, where the sentencing jury is unable to agree on whether to recommend death or to recommend mercy, the trial court must sentence the defendant to imprisonment as provided by law. *Miller v. State,* 237 Ga. 557 (229 SE2d 376) (1976). He reasons that Georgia law is like Delaware law in that if the jury is unable to agree unanimously on death, the defendant is sentenced to life, and that we should follow the lead of the Delaware Supreme Court and hold that where the jury communicates to the court that it cannot agree on the sentence to be imposed, the trial court *must* accept this communication as a verdict and impose a life sentence.

Of course, the general rule in this state is that "a motion for mistrial based on the length of the jury's deliberation is within the sound discretion of the trial court. [Cits.]" *Cofield v. State,* 247 Ga. 98, 113 (274 SE2d 530) (1981). Moreover, the trial court "is not bound to accept the jury's feeling that it is hopelessly deadlocked." *Todd v. State,* 243 Ga. 539, 542 (255 SE2d 5) (1979). Romine argues that the general rule is inapplicable to sentencing proceedings, because under the rule of *Miller* the jury has three possible choices in the sentencing phase; i.e., the jury may (1) unanimously agree to recommend death;

or (2) unanimously agree to recommend mercy; or (3) unanimously agree that it will not be able to recommend death or life. Here, Romine argues, the jury selected option (3), and the trial court should have accepted it.

However, pretermitting whether the foreman's view that the jury was hopelessly deadlocked was shared by all of the other jurors, it does not follow that, because the consequences of a hung jury on the question of sentence differ from the consequences of a hung jury on the question of guilt, the decision of whether the jury is truly deadlocked must be taken from the sound discretion of the trial judge and given to the jury.

In contrast to the policy codified in Delaware law, under Georgia law a jury is expected to review the evidence and to endeavor to reach unanimity "one way or the other" on the question of sentence, and, if possible, to affirmatively and unanimously recommend either death or mercy. OCGA §§ 17-10-2 (c) and 17-10-30 (c); *Davis v. State*, 255 Ga. 598 (25) (340 SE2d 869) (1986); *Parks v. State*, 254 Ga. 403 (14) (330 SE2d 686) (1985); *Alderman v. State*, 254 Ga. 206 (10) (32) (327 SE2d 168) (1985); *Ingram v. State*, 253 Ga. 622 (15) (323 SE2d 801) (1984); *Allen v. State*, 253 Ga. 390 (2) (321 SE2d 710) (1984); *Legare v. State*, 250 Ga. 875, 876 (302 SE2d 351) (1983). Because either verdict must be unanimous, and because the jury is not informed of the consequences of its inability to reach a verdict as to sentence, instructions to deliberate further simply do not have the effect of suggesting to a Georgia jury that it should return a death sentence.

The Florida cases relied upon by Romine are in our view even less pertinent than the *Rush* case. Not only is a unanimous agreement unnecessary to a Florida sentencing verdict — a bare majority is all that is required — but whatever the jury's recommendation, it can be overridden by the trial judge. In Georgia, of course, the verdict, as noted above, must be unanimous, and it is binding. *Spivey v. State*, 253 Ga. 187 (5) (319 SE2d 420) (1984).

Consistent with our previous cases, we hold as follows: (1) Where a jury is unable to agree on a verdict, that disagreement is not itself a verdict; and (2) whether a jury is hopelessly deadlocked is an evaluation we commit to the sound discretion of the trial court, subject to appellate review for an abuse of discretion.

(c) In this case, presentation of the evidence, the arguments and the charge took the better part of seven days. After less than four hours of deliberation, the foreman reported a "wide division" and expressed doubt about the possibility of a verdict. After three additional hours of deliberation the foreman expressed further, and more positive, doubt about the jury's ability to reach a verdict. Meanwhile, however, the jury had made considerable progress, and the division had narrowed significantly.

Considering the length and complexity of the trial, the length of time the jury deliberated before declaring itself deadlocked, and the amount of progress made in the interim, we find no abuse of discretion in the court's refusal to declare a mistrial. See *Thornton v. State*, 145 Ga. App. 793 (245 SE2d 22) (1978).

(d) Romine next argues that "the *Allen* charge is an incorrect statement of the law and is impermissibly coercive when given in the sentencing phase of a death penalty trial." The *Allen* charge, he urges, is "inherently coercive," and for that reason has been prohibited in some states, and approved only in modified form in others. But, he argues, no matter how the charge is phrased, it is error to give it at the sentencing phase of a death penalty trial.

It has been noted that "it is somewhat imprecise to refer to a single *Allen* charge. Decades of judicial interpretation have produced a variety of permutations and amplifications of the original wording, some remarkably elaborate. [Cits.]" *People v. Gainer*, 566 P2d 997 (97 ALR3d 73, 81) (1977).

The charge originally approved in the *Allen* case was summarized by the United States Supreme Court as being, "in substance, that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority." *Allen v. United States*, supra, 164 U. S. at 501.

One of the more common additions to this kind of charge is an observation that "the case must at some time be decided," or that the jury has been "selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it." *People v. Gainer*, supra. See also *Legare v. State*, supra, 250 Ga. at 876.

This language, as well as the element approved in the original charge that admonishes jurors in the minority to rethink their position in light of the majority's views, have drawn the most criticism —

the admonition to the minority jurors on the ground that it is coercive, and the observation that the case has to be decided by some jury on the ground that it is inaccurate. *Legare v. State*, supra; *People v. Gainer*, supra. Compare *Norley v. State*, 170 Ga. App. 249 (3) (316 SE2d 808) (1984) and cits.

However, unless the trial judge must declare a mistrial as soon as the jury reports difficulty reaching a verdict — and we have just held to the contrary — then some supplemental instructions concerning further deliberations are desirable, perhaps even necessary. In the commentary to Rule 15-4.4 (b) of the ABA Standards for Criminal Justice, it is stated: "[T]he *Allen* charge should not be used. It is appropriate, however, for a court to give or repeat to the jury an instruction on its responsibilities in the course of deliberations, as provided in Standard 15-4.4 (b). This may be done when the jury has indicated its inability to reach an agreement or has deliberated for some time without reaching an agreement." Id. at p. 15.143.

Standard 15-4.4 (b) "does not require the use of any particular language, but does identify the five points on which a jury might properly be advised." ABA Standards at p. 15.134. These five points are:

"(i) that in order to return a verdict, each juror must agree thereto;

"(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

"(iii) that each juror must decide the case for himself or herself but only after an impartial consideration of the evidence with the other jurors;

"(iv) that in the course of deliberations, a juror should not hesitate to reexamine his or her own views and change an opinion if the juror is convinced it is erroneous; and

"(v) that no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict." Id. at p. 15.133.

The supplemental instructions given in this case are consistent with the ABA standard, and did not single out jurors in the minority as being the only ones who might reasonably be asked to re-examine their views, or erroneously imply that a mistrial would result in a retrial. Compare *Legare v. State*, supra; and *People v. Gainer*, supra.

The supplemental instructions given here were fair and accurate. The trial court did not abuse its discretion by giving them.

2. In his third enumeration, Romine argues that the trial court erred by charging, "whatever your verdict is as to penalty, it must be unanimous . . ." This enumeration is answered by the preceding divi-

sion of this opinion.

3. In his next two enumerations of error, Romine complains of two portions of the court's charge which, Romine argues, had the impermissible effect of limiting the jury's consideration of mitigating circumstances.

In the first instance, the court instructed the jury that evidence of prior difficulties between the defendant and his parents was introduced for the limited purpose of illustrating "the state of feeling between the defendant and the alleged victims, and the bent of mind and course of conduct on the part of the accused." Later, the court told the jury: "[Y]ou are authorized to consider all of the evidence introduced here in court in this sentencing trial, presented by the state and the defendant, unless the court has previously instructed you to consider certain evidence introduced by the state or the defendant for a limited purpose only, in which event such evidence shall not be considered by you in determining punishment."

In the second instance, the court charged that "voluntary intoxication shall not be an excuse for any criminal act . . . [One who voluntarily intoxicates himself] is criminally responsible for such acts to the same extent as if he were sober." The court also charged that episodic amnesia is not a defense to a crime.

Romine argues that these charges were improper because they implied that his intoxication at the time of the crime, his memory lapses, and his prior difficulties with his parents could not be considered in mitigation. However, while the charge in this respect perhaps is not the perfect model on which future charges should be patterned, we find that the charge, considered as a whole, did not limit the jury's consideration of mitigating circumstances.

As we have noted previously, evidence relating to guilt or innocence is relevant to sentence. See *Cook v. State*, 255 Ga. 565, 586 (n. 11) (340 SE2d 891) (1986); *Alderman v. State*, 254 Ga. 206, 210 (8) (327 SE2d 168) (1985); *Blankenship v. State*, 251 Ga. 621 (308 SE2d 369) (1983). It may have particular importance where, as here, the case is being retried as to sentence and the jury is hearing for the first time, at the sentencing phase of the trial, evidence relating to the circumstances of the offense. In this case, moreover, the statutory aggravating circumstances contended by the state *were* some of the circumstances of the offense, and thus, notwithstanding Romine's conviction on two counts of murder and one count of armed robbery, the state was required to prove beyond a reasonable doubt that one count of murder was committed while the defendant was engaged in the commission of the other murder, and that the other count of murder was committed while the offender was engaged in the commission of the offense of armed robbery. OCGA § 17-10-30 (b) (2) and (c).

Romine vigorously denied the commission of these offenses. He

claimed that he was drugged by his girl friend to the point that he was only vaguely aware of his activities during the period of time in which these crimes occurred; that his girl friend was the real killer; and that his pre-trial confession was the product of a drug-induced hallucination and a desire to protect his girl friend.

Because this was a retrial as to sentence in which the defendant disputed his guilt, the court was required to include in its instructions matters that ordinarily would have been covered in the charge at the guilt-innocence phase of the trial, including credibility of witnesses, expert testimony, definitions of the crimes charged, and theories of criminal liability.

At Romine's request, the court charged on involuntary intoxication as a defense to criminal liability. The state contended that Romine was voluntarily intoxicated and so the court charged that voluntary intoxication, unlike involuntary intoxication, was not a defense to criminal liability. In view of the court's subsequent instructions informing the jury that mitigating circumstances are "those which do not constitute a justification or excuse for the offenses in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability or blame," and further specifically informing the jury that it could consider the defendant's use of drugs and alcohol in mitigation, we find no error in the court's charge on voluntary intoxication.

As for the charge that certain evidence was admitted for a limited purpose having no relevance to punishment, and not to be considered in that regard, the state — despite having requested the charge — has not explained its necessity (or its meaning), and we are unable to perceive it. Presumably, evidence properly admitted at the punishment phase of a trial is relevant, somehow, to the question of punishment, even if only in a limited way.

Nonetheless, however the jury may have construed this portion of the charge (if they noticed it at all, given its brevity), the jury could not reasonably have concluded from the charge as a whole that the defendant's prior difficulties with his parents could not be considered in mitigation. In addition to the portions of the charge quoted previously, the court's charge on mitigating circumstances included the following:

"I charge you that a jury must be allowed to consider on the basis of all relative [sic] evidence, not only why a death sentence should be imposed, but also why it should not be imposed. The jury should consider as a mitigating factor any of the circumstances of the offense that the Defendant proffers as a basis for a sentence less than death.

"Now ladies and gentlemen of the jury, I charge you that life imprisonment may be imposed even though statutory aggravating circumstances are found to exist. Under no circumstances conceivable to

you, the jury, do you have to render a death penalty recommendation.

"You may set the penalty to be imposed at life based upon any mitigating or extenuating facts and circumstances that you find to exist or you may recommend a life sentence for any reason satisfactory to you or for no reason, whether or not you find the existence of mitigating circumstances from the evidence presented to you in this case.

"You may fix the penalty at life imprisonment if you see fit to do so for any reason satisfactory to you, with or without reason.

"I charge you that the jury is empowered to consider as mitigating anything they find to be mitigating without limitation or definition. I further charge you that the jury is not required to find any mitigating circumstances in order to make a recommendation of mercy that is binding on the Court."

The court's instructions on mitigating circumstances — which are even more extensive than we set forth above, and which, at the jury's request, were repeated in full midway through the jury's deliberations — are sufficiently clear, comprehensive and complete to dispel any reasonable possibility that the jury felt at all restricted in its consideration of mitigating circumstances. Compare *Finney v. State*, 253 Ga. 346 (6) (320 SE2d 147) (1984).

4. In his sixth enumeration of error, Romine complains of the court's refusal to charge that the testimony of a witness testifying under a grant of immunity or promise of leniency, although competent, should be examined with great care. In view of the lack of evidence to support the charge, we conclude that the error, if any, in the court's refusal to give it is harmless beyond a reasonable doubt. Compare *Owens v. State*, 251 Ga. 313 (1) (305 SE2d 102) (1983); *Fleming v. State*, 236 Ga. 434, 438 (224 SE2d 15) (1976).

5. The court did not err by referring in its charge to a jury "recommendation" as to sentence, inasmuch as the charge clearly conveyed to the jury that its recommendation would be binding.

6. Romine requested the court to charge that the jury "should consider with great care and caution the evidence of any statement made by the defendant." Contrary to his 8th enumeration of error, the trial court did not err by charging the jury as requested.

7. The trial court did not err by denying Romine's request for a change of venue. *Devier v. State*, 253 Ga. 604 (4) (323 SE2d 150) (1984).

8. In his 10th enumeration of error, Romine contends the trial court erred by denying his motion to strike prospective juror Dobson for cause. Romine argues that she had two problems: "(1) [H]er lack of adequate supervision of small children in the home during her long sequestration would substantially impair her ability to concentrate on the evidence at trial; and (2) she had formed an opinion as to the appropriate punishment. . . ."

When asked by the state whether she had formed an opinion as to punishment, juror Dobson answered, "That's really hard for me to answer. I'd say at times, yes, I have." Later, the defendant's attorney asked her if she was leaning one way or the other, and she answered that she would "have to hear the facts." She was afraid she might not be able to be fair, but she would do her best. The court questioned her about her ability to be fair and attentive. She told the court that she could make up her mind based on what she heard during the trial, and that she could make arrangements for her children.

Defendant moved to strike the juror. (Challenges were taken up outside the presence of the prospective jurors during this sequestered voir dire proceeding.) The state responded that although the juror had expressed some opinion, it was not so fixed that it could not yield to the evidence and the charge, and that her problems with her children could be handled satisfactorily.

The court denied the challenge, stating: "She said she'll do [her best] and that she'll listen to the evidence and base her opinion . . . on the evidence in this case and the charge of the court . . . [S]he was very alert and giving her attention to everything that was said and I think this juror, based on what I've seen of her here, she would be a very fair juror and she would give every bit of the attention she could to the case."

We find no error. *Waters v. State*, 248 Ga. 355 (2) (283 SE2d 238) (1981).

9. Prospective juror Andrews was asked on defense voir dire, "What does the term 'life sentence' mean to you?" She answered, "Well, to me it means that you have so many years to serve — I don't know much about law. Is it true that you serve like seven, eight, nine years that you can be released?"

The court responded briefly that there would be two alternatives, death or life in prison, and the defense voir dire continued on other matters. After it concluded, the state was given permission to ask further questions, and it re-opened the inquiry into the juror's understanding of a life sentence, asking, "Would you finish your answer?" She stated, "Well, what I mean is, they give somebody life and then in so many years they're out again. Is that not true in some cases?"

At this point, the court questioned the juror, as follows:

"The Court: M'am, let me state this: we can't get into those and I don't know how to answer you. I think you've answered the other questions.

"But you're willing to look at the evidence in the case and treat this case and leave it up to whoever it might be somewhere else to determine whether a man should be released or not?

"A That's right.

"The Court: In other words, you're going to make your decision

based on the evidence in this case and what I charge you should be done?

"A Yes, sir. I'd have to hear the evidence first.

"The Court: And what somebody else might do down the road, you're not going to try to prejudge what they should do?

"A No.

"The Court: Or anyone else?

"A No.

"The Court: You're going to be fair and honest with reference to this case right here?

"A That's right."

In *Caldwell v. Mississippi*, 472 U. S. ___ (105 SC 2633, 86 LE2d 231) (1985) the United States Supreme Court held that a death sentence was invalid where a jury imposed it after a prosecutor argued to the jury that, if its sentence determination was unfair, it could be corrected by an appellate court. Such an argument, the Court reasoned, was misleading as to the nature of appellate review, and might impermissibly tempt the jury to delegate its sentencing responsibility to the appellate court.

Romine argues that the trial court's colloquy with prospective juror Andrews violated the principles of *Caldwell v. Mississippi*, supra. We need not fully examine this contention, however. The trial court's response (to a matter injected into the voir dire, in the first instance, by the defendant) was repeated to no other juror, and although the defendant did object to the response, he did not challenge the juror for cause, and she did not serve on the jury that tried the case. Thus, Romine cannot complain that any member of the *jury* was inappropriately instructed, nor can he complain that this prospective juror was not stricken for cause.

We find no harmful error.

10. In his closing argument, the assistant district attorney asked the jury: ". . . He'd been to the hospital and then he came back rehabilitated, right?

"And you've heard a lot about rehabilitation. How many times has this man been rehabilitated? He gets rehabilitated when it comes right down to the wire. When you're in jail, you get rehabilitated. When you go to a hospital for six months, he spent six months for drug abuse, you get rehabilitated.

"Quite frankly ladies and gentlemen, if he were released from jail, do you think that he would be rehabilitated? Would he go back to drugs like he has before? Would he be able to avoid the temptation like he's admitted to you?"

Romine contends this argument violated OCGA § 17-8-76, which provides, in parts (a) and (b), as follows:

"(a) No attorney at law in a criminal case shall argue to or in the

presence of the jury that a defendant, if convicted, may not be required to suffer the full penalty imposed by the court or jury because pardon, parole, or clemency of any nature may be granted by the Governor, the State Board of Pardons and Paroles, or other proper authority vested with the right to grant clemency.

"(b) If counsel for either side in a criminal case argues to or in the presence of the jury as provided in subsection (a) of this Code section, opposing counsel shall have the right immediately to request the court to declare a mistrial, in which case it shall be mandatory upon the court to declare a mistrial. Failure to declare a mistrial shall constitute reversible error."

A mistrial is mandatory only if the argument contravenes the statute. Since the assistant district attorney did not specifically refer to pardon, parole, or other clemency, the statute was not contravened, and the trial court was not required to declare a mistrial. *Finney v. State*, supra, 253 Ga. at 348-49; *Gilreath v. State*, 247 Ga. 814 (15) (279 SE2d 650) (1981). The court views the prosecutor's argument with disfavor, but we hold that it does not sink to the level of reversible error.

The trial court did not abuse its discretion by denying the motion for mistrial (which was not made until after the conclusion of the arguments) and no other remedies (e.g., curative instructions) were requested. See *Horton v. State*, 249 Ga. 871 (7) (295 SE2d 281) (1982).

11. On appeal, Romine for the first time complains of additional portions of the prosecutor's closing argument. Having examined the state's argument in its entirety, we conclude that nowhere did the prosecutor seriously overstep his bounds. We find no reversible error. See *Davis v. State*, 255 Ga. 598 (16) (340 SE2d 869) (1986); *Cook v. State*, 255 Ga. 565 (12 C) (340 SE2d 891) (1986); *Ford v. State*, 255 Ga. 81 (8 i) (335 SE2d 567) (1985); *Walker v. State*, 254 Ga. 149 (14) (327 SE2d 475) (1985); *Spivey v. State*, supra, 253 Ga. 187 (4).

*Sentence Review*

12. The jury found that, as to Count 1, the "murder of Avilee Romine was committed while the offender was engaged in the commission of an additional capital felony, that being the armed robbery of Avilee Romine." As to Count 2, the jury found that the "murder of Roy Lee Romine was committed while the offender was engaged in the commission of an additional capital felony, that being the murder of Avilee Romine." See OCGA § 17-10-30 (b) (2).

These findings are supported by the evidence. OCGA § 17-10-35 (c) (2). Compare *Romine v. State*, supra, 251 Ga. 208 (8).

13. The death sentences were not imposed in this case under the influence of passion, prejudice, or any other arbitrary factor. OCGA §

17-10-35 (c) (1).

14. The sentences imposed in this case are neither excessive nor disproportionate, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3).

*Judgment affirmed. All the Justices concur.*

DECIDED DECEMBER 2, 1986 —
RECONSIDERATION DENIED DECEMBER 17, 1986.

*J. Roger Thompson, Thomas P. Lenzer,* for appellant.
*Roger G. Queen, District Attorney, William H. Boggs, Robert Sparks, Assistant District Attorneys, Michael J. Bowers, Attorney General, Paula K. Smith, Assistant Attorney General,* for appellee.

APPENDIX.

*Cargill v. State,* 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State,* 253 Ga. 622 (323 SE2d 801) (1984); *Finney v. State,* 253 Ga. 346 (320 SE2d 147) (1984); *Spivey v. State,* 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State,* 252 Ga. 227 (314 SE2d 83) (1984); *Putman v. State,* 251 Ga. 605 (308 SE2d 145) (1983); *Mincey v. State,* 251 Ga. 255 (304 SE2d 882) (1983); *Wilson v. State,* 250 Ga. 630 (300 SE2d 640) (1983); *Rivers v. State,* 250 Ga. 288 (298 SE2d 10) (1982); *Jones v. State,* 249 Ga. 605 (293 SE2d 708) (1982) *Berryhill v. State,* 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State,* 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State,* 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State,* 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State,* 243 Ga. 627 (255 SE2d 718) (1979); *Westbrook v. State,* 242 Ga. 151 (249 SE2d 524) (1978); *Corn v. State,* 240 Ga. 130 (240 SE2d 694) (1977); *Peek v. State,* 239 Ga. 422 (238 SE2d 12) (1977); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974).