## 45437. LONCHAR v. THE STATE.
### (369 SE2d 749)

Bell, Justice.

Larry Grant Lonchar was convicted by a jury in DeKalb County of three counts of murder and one count of aggravated assault. He was sentenced to death on each of the murder counts.[1]

1. Charles Wayne Smith and his son, Steven Smith, ran a bookmaking operation out of a condominium in DeKalb County. Lonchar became several thousand dollars in debt to the operation, and on October 13, 1986, visited the condominium, accompanied by Mitchell Wells. At the time they visited, four people were in the condominium. The three murder victims, Wayne Smith, Steven Smith, and Wayne's companion, Margaret Sweat, were in the living room. Richard Smith (another of Wayne Smith's sons), the aggravated assault victim, was in a bedroom. At trial Richard Smith testified that he heard a knock on the door and then saw Lonchar enter the living room. He added that Lonchar displayed a badge and identified himself as special agent Larry Lonchar. Wayne Smith and Steven Smith were then handcuffed.

Richard Smith heard four or five shots from the living room, and then Wells came to his bedroom, shot him several times and left. He pretended he was dead while the condominium was ransacked. Shortly thereafter, afraid he would bleed to death, he picked up the extension telephone in the bedroom and heard Sweat talking to the police. Then she yelled, "they're back." Richard Smith crawled to the

---

[1] The crimes were committed on October 13, 1986. Lonchar was arrested in Texas on October 20, 1986 and indicted on November 24. The case was tried June 22 through June 27, 1987, and Lonchar was sentenced on the latter date. A motion for new trial was filed July 24, 1987, and amended on October 12, 1987. The court reporter certified the transcript on July 29, 1987. After a hearing, the motion for new trial was denied on November 5, 1987. The case was docketed in this court January 26, 1988. After Lonchar was granted an extension of time to file his enumerations of error, oral arguments were postponed to the April term of court, and the case was orally argued April 13, 1988.

living room and saw a man wearing a trench coat leave the condominium.

Sweat's call was recorded by the police department:

911: DeKalb Emergency 911.
Caller: Police.
911: What address?
Caller: [ ]
911: What's the problem?
Caller: Everybody's been shot.
911: Who's been shot?
Caller: Me — and —
911: With a gun?
Caller: Yes.
911: Who did it?
Caller: I don't know.
911: Is that a house or an apartment?
Caller: It's a condominium. . . .
911: Okay. Now you say everybody's been shot, I already got you help on the way, but when you say everybody's been shot, how many?
Caller: Uh, me.
911: Where are you shot at?
Caller: In the living room — I've crawled to the phone.
911: I mean what part of your body, Ma'am.
Caller: I think my stomach — they're coming back in — please- (inaudible)
911: Who did it? Give me a description of them!
Caller: Why are you doing this. Please — (inaudible). Please, please, I don't even know your name. Please — please Larry. I don't even know your n —.

Wayne Smith was shot in the chest, the back, and the head. Steven Smith was shot in the chest and in the head. Margaret Sweat was shot in the shoulder, stabbed in the neck 17 times, and stabbed in the chest three times. Richard Smith was shot in the back and was grazed on his head. Of the four occupants of the condominium, he was the only survivor.

Lonchar showed up at his cousin's house that evening wearing a trench coat. His hands were cut. He asked if Wells had been there earlier that day, and responded to the cousin's affirmative answer by threatening to kill Wells. Lonchar complained to his cousin that he "couldn't kill the bitch," and told him he had cut her throat. His cousin drove him to Chattanooga, where he caught a plane to Texas. He was arrested at a Western Union Station in Mission, Texas, when he went there to pick up money his cousin had wired him.

(a) Contrary to Lonchar's contention, the trial court did not err by instructing the jury both on parties to a crime as defined in OCGA § 16-2-20 *and* on the law of conspiracy in its evidentiary sense. *Thomas v. State*, 255 Ga. 38 (2) (334 SE2d 675) (1985).

(b) Lonchar contends it was error to instruct the jury on felony murder as well as malice murder where the indictment charged only the latter. See *Crawford v. State*, 254 Ga. 435 (1) (330 SE2d 567) (1985). The state contends the indictment sufficiently alleged both. The jury was given a verdict form requiring it to specify as to each murder count of the indictment whether Lonchar was guilty of malice murder, guilty of felony murder, or not guilty. See *Allen v. State*, 253 Ga. 390, 395 (fn. 3) (321 SE2d 710) (1984). Since the jury specifically found Lonchar guilty of "malice murder" on each count, any issue of felony murder is moot. *Holiday v. State*, 258 Ga. 393 (12) (___ SE2d ___) (1988).

(c) The evidence shows that Lonchar himself shot three people, one of whom he also stabbed to death, and was a party to all of the criminal events occurring inside the Smith condominium.[2] His conviction on all counts is supported by the evidence. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Before the voir dire began, Lonchar's attorney informed the court that Lonchar wished to absent himself from the trial as soon as the jury was selected. The attorney stated he had advised Lonchar against such a move, but that was Lonchar's desire nonetheless. The court adjourned to its chambers, and discussed the matter with Lonchar and his attorney, outside the presence of the state's attorneys. Lonchar stated to the court that he did not have a case, that the outcome was a foregone conclusion, and that he had not been assisting his attorney anyway. He stated further:

I just repeat the way I feel, you know. My presence is irrele-

---

[2] Ballistics examination showed that two guns were involved. Bullets from both guns were recovered from the bodies of two of the deceased victims, indicating that both defendants had shot them, while Margaret Sweat and Richard Smith were each shot by a different gun, but by one of the two guns used to kill the other two victims. Since Wells shot Richard Smith, it is reasonable to infer that Lonchar shot Margaret Sweat. Although Lonchar's attorney contends in his brief that a third, unidentified person was involved in the crime, there is no real evidence to support this contention.

Richard Smith was in the bedroom when the killers first arrived. He never saw more than one of them at the same time. He first saw Lonchar's reflection in the bedroom mirror and Lonchar was not wearing a trench coat. He next saw Mitch Wells when the latter entered his bedroom and shot him. And then when the killers, or at least one of them, returned, Richard Smith caught a glimpse of one of them from behind, as he was leaving, and this one wore a trench coat. Since the evidence, including Lonchar's own admission, shows that he was the one who stabbed Margaret Sweat, and since he showed up at his cousin's home later that day wearing a trench coat, the most reasonable inference from the evidence is that the so-called "third" person Richard Smith saw was in fact Larry Lonchar.

vant. And like I say, I haven't been assisting [my attorney] and I am not going to start assisting him, and I am asking, you know, like I say, I realize at times I will have to be present. I realize that and I will cooperate. But as far as, you — I have read that the law says once the jury is impaneled that I don't have to be present, you know. I don't want to cause a scene where you have to handcuff me and chain me to the seat and gag me and all that. However, I feel, you know, if that is my only alternative, then I will, I mean, that is what I am asking, you know to avoid all of this, you know. I know what is going to happen in this case and, you know, there is nothing I can do about it . . . .

Lonchar stated that he understood his right to assist his attorney and present evidence but that he was "just being realistic . . . I have no case, Your Honor . . . ."
The court stated:

I will give him a chance to think about it. Obviously, I do want him during the voir dire which may take some period of time, and . . . at that point I will reconsider it and I will ask him to reconsider.

After the jury was selected, the court addressed the defendant as follows:

THE COURT: Mr. Lonchar.

MR. LEIPOLD: Stand up.

THE COURT: You recall the discussion that we had yesterday morning, sir?

MR. LONCHAR: Yes, sir.

THE COURT: You will recall both the Court's request and your attorney's request that you remain in the courtroom, but that I told you that that was the decision that I would probably allow you to make. I wanted you to sit through the voir dire process and I wanted you to have an opportunity to reconsider that issue.
I am going to allow you, if you wish, to withdraw yourself during those parts of the trial that you think is — that you want to be excused from, if you wish to do so. I want to advise you, however, that, obviously, you would not be here, first of all, to assist your attorney in responding to questions

and certainly you would not be here to evaluate what it is that your attorney does in your behalf. If you want to voluntarily give up those rights that you are, in fact, giving up a very valuable right that you have, and I am sure Mr. Leipold is going to do an excellent job, do the best possible job that he can do on your behalf, there is no question about that. There is, however, no question that it is always better to have your client with you in court, both for strategic purposes and also for information purposes. Mr. Lonchar do you understand what I am telling you?

MR. LONCHAR: Yes.

THE COURT: Now are you telling me that you still want to be absent from certain parts of the trial?

MR. LONCHAR: Yes, sir.

THE COURT: Do you understand that there may be certain parts of the trial which I will have to direct that you be here, for identification and for certain other purposes, do you understand that?

MR. LONCHAR: Yes, sir.

THE COURT: All right, sir. I will at any time give you the opportunity to come back into Court whenever you wish to come back into Court and I will do whatever is necessary to facilitate your re-entry back into Court out of the presence of the jury. So, you can come back in whenever you'd like. Do you understand that, Mr. Lonchar?

MR. LONCHAR: Yes, sir.

Periodically throughout the trial, the court asked the defendant if he wanted to return to the courtroom for the remainder of the trial. Lonchar declined, and except for a few brief instances in which he was returned to the courtroom to be identified by a witness, the guilt-phase evidence was presented in his absence.[3]

(a) A criminal defendant "is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if

---

[3] Lonchar was present at the sentencing phase while the state proved in aggravation that Lonchar had six previous felony convictions. Lonchar refused to remain while his father testified on his behalf. However, he was present for the sentencing-phase charge conference, the closing arguments, and the charge.

his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U. S. ___ (107 SC 2658, 2667, 96 LE2d 631) (1987). In the case of non-custodial defendants, the defendant can waive his right to be present by voluntarily absenting himself. *Taylor v. United States*, 414 U. S. 17 (94 SC 194, 38 LE2d 174) (1973). A defendant in custody can lose his right to be present by disruptive behavior. *Illinois v. Allen*, 397 U. S. 337 (90 SC 1057, 25 LE2d 353) (1970).

Lonchar relies on our recent observation in *Tieu v. State*, 257 Ga. 281, 284 (358 SE2d 247) (1987), that "it is doubtful that a defendant who has been charged with a capital felony and who is in police custody has the capacity to waive his right to be present at the commencement of the trial." Lonchar, however, unlike Tieu, *was* present at the *commencement* of his trial. We have rejected a blanket non-waiver rule for capital defendants in custody. *State v. Phillips*, 247 Ga. 246 (275 SE2d 323) (1981). We hold that a defendant has a right to be present at his trial, but may waive that right, even in a death-penalty case. See *United States v. Crutcher*, 405 F2d 239, 243 (2nd Cir. 1968).

(b) Lonchar argues that even if the right *may* be waived, he was not fully and properly informed of his rights and there was no valid waiver. The trial court, he argues,

> did not go into any specific detail on his right to confront witnesses under the Sixth Amendment to the U. S. Constitution, his various due process rights under the Fourteenth Amendment to the U. S. . . . Constitution . . . or identification problems that could be created by this situation . . . .

Although the "right to confront witnesses" was not mentioned *per se*, it is clear from the in-chambers colloquy that Lonchar understood that the state's witnesses would testify in open court. In fact, that is why he chose to absent himself — he did not want to hear their testimony. It is also clear he understood that his attorney would have the right to ask questions of these witnesses. The court advised him that his absence would mean that he would not be able to assist his attorney in this respect.

Lonchar does not specify what due process rights should have been explained to him by the court. He understood that he had a right to consult with his attorney, to confront the witnesses against him and to offer witnesses of his own. He also understood — or should have, because the court so advised him — that his absence would likely be prejudicial to his case.[4]

---

[4] His threatened disruptive behavior would likely have been *more* prejudicial to his case,

We agree with the trial court: Lonchar knew what he was doing, and voluntarily absented himself from the trial. He had a right to do so, and the court's ruling was not error.

3. The court's death-qualification rulings were not erroneous. *Pope v. State*, 256 Ga. 195 (7) (345 SE2d 831) (1986); *Alderman v. State*, 254 Ga. 206 (4) (327 SE2d 168) (1985).

4. Lonchar moved for mistrial when a law officer testified, unresponsively, that the person with whom Lonchar was staying in Texas was a "local drug dealer." The trial court rebuked the witness and instructed the jury to disregard the remark, but denied the motion for mistrial. There was no abuse of discretion. *Sabel v. State*, 250 Ga. 640 (5) (300 SE2d 663) (1983).

5. Lonchar contends the court erred by not declaring a mistrial when the alternate jurors deliberated with the regular jury at the sentencing phase of the trial.

As provided by law, the alternate jurors were kept with the jury during the trial of the guilt phase of the case. OCGA § 15-12-170. When the case was presented to the jury for deliberation on the issue of guilt, the alternates were separated from the jury until the jury reached its verdict, as required by OCGA § 15-12-171. After the verdict of guilty was published, the court recessed for the evening, and the jurors went home.[5] The next day, the alternates remained with the jury during the sentencing phase of the trial *until* the case was again presented to the jury for deliberation, when they were again separated from the regular jury. At no time during the actual *deliberations* were the alternate jurors with the jury. Especially in view of the trial court's many admonitions during the trial that the jurors should not discuss the case with each other nor begin deliberations until instructed to do so, no violation of OCGA § 15-12-171 has been shown. There is no requirement that alternate jurors in a death penalty case be excused once the jury has rendered a verdict as to guilt, and no need to keep them separate when the jury is *not* deliberating.

6. The state was not precluded from urging the presence of OCGA §§ 17-10-30 (b) (2) and (b) (7) simply because aggravated battery is a fact supporting both circumstances. *Parks v. State*, 254 Ga. 403 (16) (330 SE2d 686) (1985).

7. The prosecutor did not express a personal opinion during his closing argument. Compare *Ford v. State*, 255 Ga. 81, 91 (335 SE2d 567) (1985).

8. During the sentencing phase deliberations, the jury sent the court a note, to which the court responded as follows:

had he been forced to remain.

[5] Jury dispersal was consented to by the defendant at the outset of the trial. See OCGA § 15-12-142; *Jones v. State*, 243 Ga. 820 (3) (256 SE2d 907) (1979).

I received a request for information. The question reads: 'We'd like you to instruct us as to what we do if we cannot reach an unanimous decision.'

At some point, obviously, if you cannot reach an unanimous decision, you can report that fact to me. But I don't mind telling you the Court doesn't think you have been deliberating long enough yet to be able to make that decision. Certainly, the Court is not at this point prepared to accept a decision and, obviously, a difficult case, as all cases that are required — the Court would just ask you to continue your deliberations.

At some point I will let you take a dinner recess, if you'd like, and have the deputies take you to dinner, if you'd like to do that, but I don't think you have been deliberating — you have been deliberating for less than four hours and the Court doesn't think you can say you can't reach an unanimous decision. I just ask you to continue your deliberations.

This was not, as the defendant contends, an *Allen* charge, and it was not coercive. The court did not err. Compare *Romine v. State*, 256 Ga. 521 (1) (350 SE2d 446) (1986).

9. On each count of murder, the jury found that the offense of murder was committed while the offender was engaged in the commission of another capital felony and while the offender was engaged in the commission of an aggravated battery.[6] In addition, the jury found that each offense of murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture and an aggravated battery to the victim. The evidence supports these findings. OCGA § 17-10-35 (c) (2).

10. In view of the circumstances of this crime and Lonchar's criminal record, his death sentence is neither excessive nor disproportionate to sentences imposed in similar cases. OCGA § 17-10-35 (c) (3). We do not find that the sentence of death was imposed under the impermissible influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1). The similar cases listed in the appendix support the imposition of the death sentence in this case.

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 13, 1988 —
RECONSIDERATION DENIED JULY 29, 1988.

*William M. Warner,* for appellant.

---

[6] The verdict itself did not specify the supporting capital felony, but the only one as to which the jury was instructed was murder.

*Robert E. Wilson, District Attorney, Elisabeth G. MacNamara, Assistant District Attorney, Michael J. Bowers, Attorney General, Andrew S. Ree,* for appellee.

APPENDIX.

*Frazier v. State,* 257 Ga. 690 (362 SE2d 351) (1987); *Ford v. State,* 257 Ga. 461 (360 SE2d 258) (1987); *Romine v. State,* 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State,* 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State,* 253 Ga. 622 (323 SE2d 801) (1984); *Finney v. State,* 253 Ga. 346 (320 SE2d 147) (1984); *Spivey v. State,* 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State,* 252 Ga. 227 (314 SE2d 83) (1984); *Putman v. State,* 251 Ga. 605 (308 SE2d 145) (1983); *Mincey v. State,* 251 Ga. 255 (304 SE2d 882) (1983); *Wilson v. State,* 250 Ga. 630 (300 SE2d 640) (1983); *Rivers v. State,* 250 Ga. 288 (298 SE2d 10) (1982); *Jones v. State,* 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State,* 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State,* 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State,* 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State,* 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State,* 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State,* 240 Ga. 130 (240 SE2d 694) (1977); *Peek v. State,* 239 Ga. 422 (238 SE2d 12) (1977); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974).