[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 15, 2001

THOMAS K. KAHN
CLERK

_____

No. 99-12449

_____

D.C. Docket No. 96-00102-2-CV-WCO

LARRY ROMINE,

Petitioner-Appellant,

versus

FREDERICK J. HEAD, Warden,
Georgia Diagnostic and
Classification Center,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 15, 2001)

Before CARNES, BARKETT and MARCUS, Circuit Judges.

CARNES, Circuit Judge:

This is a death penalty case. The Georgia Supreme Court succinctly summarized the key facts concerning the crime as follows: "Larry Romine, a former gospel singer and occasional preacher whose descent into a life of drugs and adultery met with severe parental disapproval and opposition, entered his parents' home one day while they were at work, waited for their return, and then killed them both with a .16 gauge shotgun." Romine v. State, 350 S.E.2d 446, 448 (Ga. 1986), cert. denied, 481 U.S. 1024, 107 S. Ct. 1912 (1987). The murder occurred twenty years ago and since then, to put it in colloquial terms, the case has been tied up in the courts. For reasons we will explain, more court proceedings are to come.

For what he did to his parents, Romine was convicted by a jury of two counts of murder and one count of armed robbery. He was sentenced to death on the two murder counts and to life imprisonment on the armed robbery count. In the initial appeal, the Georgia Supreme Court affirmed all of the convictions and the life sentence on the armed robbery count, but it reversed the death sentences on the murder count because Romine had been denied a continuance he needed to present

a mitigating circumstance witness.  See Romine v. State, 305 S.E.2d 93 (Ga. 1983).

At the  resentencing trial in 1985 the jury in deciding upon a death sentence found the existence of one statutory aggravating circumstance as to each murder. The aggravating circumstance as to the murder of Romine's mother was that he committed it while robbing her (of her purse and a paycheck), and the aggravating circumstance as to the murder of Romine's father was that he committed it while he was also engaged in committing the murder of  his mother.  See Romine, 350 S.E.2d at 456-57.  The Georgia Supreme Court affirmed the two death sentences on direct appeal.  Id. at 457.

After losing on direct appeal, Romine pursued state collateral relief.  In 1989 he filed a state habeas corpus petition in the Superior Court of Butts County, Georgia, which was finally denied in an unpublished order in 1993.  The Georgia Supreme Court denied Romine's application for a certificate of probable cause to appeal the trial court's denial of collateral relief, and the  United States Supreme Court denied certiorari in that proceeding in 1994.  See Romine v. Zant, 512 U.S. 1213, 114 S. Ct. 2694 (1994).

In 1996, Romine filed a federal habeas corpus petition in the Untied States District Court for the Northern District of Georgia, which the court denied in 1999. This is the appeal from that denial.

**DISCUSSION**

Romine raises two issues that merit discussion, one relating to an arguable conflict of interest by trial counsel and the other involving the prosecutor's reliance upon Biblical authority during closing argument.[1]

A. THE CONCURRENT REPRESENTATION ISSUE

Romine was married to Diane Romine when the events relevant to this appeal occurred. On February 15, 1982, she appeared pro se before Pickens County Superior Court Judge Frank Mills, III, and pleaded guilty to charges of forgery and theft by taking. The forgery charges stemmed from her involvement in a scheme to obtain prescription drugs by presenting forged prescriptions to pharmacies, and the theft by taking charge stemmed from her having stolen some

---

[1] In addition to the two issues we discuss, Romine also contends that his counsel at the resentencing trial rendered ineffective assistance and that his constitutional rights were violated when a juror consulted the Bible during deliberations. In view of our disposition of the issue involving the prosecutor's closing argument, those other two issues are moot.

prescription pads from a doctor's office.[2]  During the plea colloquy, Mrs. Romine confirmed to Assistant District Attorney George Weaver that no promises had been made to her and that she had not been offered lighter treatment for telling the truth.  After Weaver presented testimony from three witnesses who described Mrs. Romine's role in the crimes, Judge Mills sentenced her to ten years, five to serve and five on probation.

George Thomas, along with his partner Mark Shriver, defended Romine at his original trial.  In his investigation of Romine's case, Thomas was frustrated by the reluctance of many witnesses, including Diane Romine, to provide information about the facts surrounding the murders.  Meanwhile, Thomas was himself jailed on charges of contempt in another case, and he ended up in a jail cell with Mrs. Romine and several other women.  (Apparently, the jailer put Thomas in the women's cell as a joke.)  During their quality time together, Mrs. Romine told Thomas why she was incarcerated and asked him to intervene on her behalf "to see that she got the sentence she was promised and not the sentence that she got."

---

[2] Mrs. Romine was originally charged with forgery and burglary.  She pleaded guilty to the forgery charges.  However, at the plea colloquy she asked that the the burglary charge be reduced to theft by taking, because she felt she had not committed a burglary.  Assistant District Attorney George Weaver agreed to reduce the charge, because, according to Weaver, "[t]here is some question as to [whether Mrs. Romine had] authority [to enter the doctor's office]," and because there were "so many other felonies [i.e., forgeries]" charged in the case.  Mrs. Romine then pleaded guilty to the reduced charge of theft by taking.

Thomas agreed to represent Mrs. Romine in that regard. He did so in order to elicit information about Romine's case from the formerly uncooperative Mrs. Romine and to enlist her help in his defense of Romine.

On March 12, 1982, seventeen days before Romine's first trial began, Diane Romine came back before Judge Mills for a reduction of sentence. Although she was represented in that matter by George Thomas, the impetus for the reduction of sentence came from Judge Mills. He set the matter in motion, and ultimately reduced the sentence so that instead of serving five years in jail followed by five years of probation, Mrs. Romine would only serve one year in jail to be followed by nine years of probation. Judge Mills acted on his own, in part because of some information that had come to his attention. The DA's office took no position on whether Mrs. Romine's sentence should be reduced.

Thomas did not represent Mrs. Romine in any matter after her March 12, 1982 sentence reduction proceeding.[3]

Thomas had heard rumors while investigating Romine's case that Mrs. Romine had made a deal with the state to receive a lenient sentence in her forgery

---

[3] There is no evidence that Thomas represented Mrs. Romine at any time during Romine's first trial. There is evidence, however, of his representation of Mrs. Romine at her sentence reduction proceeding on March 12, 1982, more than two weeks before Romine's trial. Thomas' name appears on the amended sentence order, and the district court found as a fact that Thomas did represent Mrs. Romine at that proceeding.

case.[4] However, he was unable to substantiate any of those rumors.[5] On July 21, 1981, before Romine's first trial began, Thomas filed a motion to require the state to reveal any deals between the state and Mrs. Romine. At the August 5, 1981 hearing on that motion, District Attorney Rafe Banks, the lead prosecutor at Romine's first trial, stated that he did not know of any deals between the District Attorney or the Georgia Bureau of Investigation ("GBI") and Mrs. Romine. Mrs. Romine herself testified that there was no deal between her and the state regarding

[4] The precise nature of the rumored deal is unclear. Diane Romine had previously worked in the Sheriff's Office, and Thomas testified at the state habeas proceeding that he had heard that the Sheriff wanted to prevent Mrs. Romine from revealing some information that could damage the Sheriff's Office or the Sheriff himself.

Thomas also testified that Mrs. Romine may have had a deal with the Georgia Bureau of Investigation ("GBI"), but GBI agents and Mrs. Romine denied that. Mrs. Romine testified in Romine's first trial that she visited him in jail shortly after his arrest and, pursuant to instructions Romine gave her during that visit, removed certain documents from his car. Later, at the state habeas hearing, GBI Agent Fran Wiley testified that Mrs. Romine had told the GBI what she had talked about with Romine during the jailhouse visit. Agent Wiley also testified that after Mrs. Romine removed the documents from Romine's car, she turned them over to the GBI. Though Agent Wiley admitted that Mrs. Romine cooperated with the GBI to some extent, the GBI agents and Mrs. Romine denied that any deal existed between them.

[5] At the state habeas hearing Mark Shriver, the attorney who assisted Thomas in representing Romine, testified that the District Attorney eventually "admitted that there was a deal" that Mrs. Romine would have her sentence in the forgery case reduced in return for her cooperation in Romine's first trial. Shriver clarified that "[i]t wasn't a great deal that all the charges were going to be dropped or dismissed or anything like that, but there was some tradeoff made." Shriver's testimony was based on his recollection of conversations and events that took place around the time of the first trial, approximately ten years earlier. Thomas, and not Shriver, was the one who primarily dealt with Ms. Romine during that time. Because all of the other evidence and testimony presented on this issue, including that of Mrs. Romine, the GBI agents, and the District Attorney was consistent that no deal existed, the state habeas court found as a fact there was no deal with Mrs. Romine.

7

Romine's case.  In other words, Thomas' motion to have any deals revealed was granted, but the response was that no deal existed.

The first trial began on March 29, 1982, and included a familiar cast of characters:  Diane Romine appeared as a witness for the State; Judge Frank Mills, III, who issued both the original and the amended sentences in Mrs. Romine's case, presided over the trial;  George Thomas, who represented Mrs. Romine at her sentence reduction proceeding, was one of two attorneys for the defense; and George Weaver, the prosecutor in  Mrs. Romine's case and at her sentence reduction proceeding, helped prosecute the case against Romine.

That same day, and soon after the trial began, Thomas filed a renewed motion to require the State to reveal any deals with Mrs. Romine.  He did so because Mrs. Romine's sentence had been reduced just seventeen days earlier.  At the hearing on that motion, Judge Mills stated into the record that he had reduced Mrs. Romine's sentence independently from the district attorney's office.  The judge explained that he had acted on his own to  reduce  Mrs. Romine's sentence for several reasons.  One was that a co-defendant, Ginger McIntyre, had testified that  Mrs. Romine was not as culpable in committing the forgeries as Ms. McIntyre had depicted her to be during other testimony.  The judge was also moved to be more lenient towards Mrs. Romine by correspondence he had received pertaining

8

to her, including a letter from her parents, and because her co-defendants had received relatively light sentences. To the judge's knowledge, and he is the one who reduced her sentence, there was no deal between the State and Mrs. Romine.[6]

When Mrs. Romine appeared as a witness for the State at the first trial, she testified about Romine's drug use, his adultery, and about certain events that occurred after his parents were killed. Thomas cross-examined Mrs. Romine, but did not attempt to impeach her with her prior convictions, her sentence reduction in the forgery case, or her possible deals with the State. At the conclusion of that cross-examination, Judge Mills called Thomas to the bench and asked him about his failure to use Mrs. Romine's prior convictions to impeach her. Thomas told the judge that he was aware he could impeach Mrs. Romine with her prior convictions and that he had obtained certified copies of those convictions for that purpose, but said that he had not decided whether to make use of them. Thomas then reserved the right to recall Mrs. Romine for cross-examination. He never did so. When Thomas was questioned approximately ten years later at the state habeas hearing

---

[6] Later, in testimony at the state habeas hearing, Assistant District Attorney Weaver denied that the state had made any deals with Mrs. Romine, and GBI Special Agent Stanley Thompson and Assistant Special Agent Fran Wiley denied the existence of any deals between the GBI and Mrs. Romine.

about his failure to impeach Mrs. Romine at Romine's original trial, he could not remember why he did not bring up her previous convictions.

The state habeas court rejected Romine's claim that attorney Thomas labored under a conflict of interest because of his representation of Mrs. Romine in connection with her resentencing. The judge reasoned that because Thomas was not representing Mrs. Romine at the time of the trial there was no evidence of any actual conflict of interest, and "Mr. Thomas' actions vis-a-vis Diane Romine did not result in any adverse impact on petitioner because Mr. Thomas was acting in an effort to help petitioner."

Romine raised his conflict of interest claim in his federal habeas corpus petition, too, and the district court rejected it. Applying 28 U.S.C. § 2254(e)(1), the court accepted the state court's factfindings that Thomas no longer represented Mrs. Romine at the time of the first trial, that trial having begun more than two weeks after the conclusion of her sentence reduction hearing. The district court also agreed with the state habeas finding that "without question Diane Romine had no deal with the State." Finally, the court searched the record and found no evidence that Thomas had learned any confidential information during his brief representation of Mrs. Romine. As a result of those key factfindings, the district court treated the case as one involving successive representation instead of

10

simultaneous representation, and held that there was neither an active representation of conflicting interests or an actual conflict of interest that adversely affected the lawyer's performance.  Accordingly, it concluded that Romine had failed to establish, as required by § 2254(d)(1), that the state habeas court's decision, which applied the test set out in Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708 (1980), and Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114 (1987), resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law set out in Supreme Court decisions.  We agree.

Cuyler and Burger were cases involving simultaneous representation, and the state court's decision in this successive representation case is not contrary to anything in either of those decisions.  Nor is the state court decision on this issue an unreasonable application of either Cuyler or Burger.  Whatever might be the result if Thomas had been representing Mrs. Romine at the time of the trial, he was not.  Whatever might be the result if Thomas had learned confidential information during his representation of her, he did not.  The same is true of any deal between Mrs. Romine and the State relating to the charges against her or the sentence she received.  Whatever might be the result if there was such a deal, no deal existed.

And whatever might be the result if the reason that Thomas failed to impeach Mrs. Romine with her prior convictions was his previous representation of

11

her, that was not his reason. Or at least, Romine, who had the burden on it, failed to establish that was his reason. As the district court explained, after Mrs. Romine gave testimony harmful to the defense during direct, Thomas used cross-examination to elicit testimony from her that was favorable to Romine. That testimony, which his wife was in a good position to provide, concerned Romine's past and his relationship with his children, his parents (the victims), with others, and his drug use. Thomas came to the trial prepared to impeach Mrs. Romine, having brought with him certified copies of her prior convictions, but at the conclusion of her testimony he had not decided whether to use them. He postponed a decision by reserving the right to call Mrs. Romine back to the stand for that purpose, but ultimately decided not to do so.

The problem is that by the time Thomas was asked about the matter at the state habeas hearing, a decade had passed and he could no longer remember his reasoning about not using Mrs. Romine's prior convictions to impeach her. But the placement of burdens in a federal habeas proceeding means that the effect of that problem falls on Romine. A petitioner has the burden of establishing his right to federal habeas relief and of proving all facts necessary to show a constitutional violation. See, e.g., Delap v. Dugger, 890 F.2d 285, 311 (11th Cir. 1989). Where, as here, the evidence does not clearly explain what happened, or more accurately

12

why something failed to happen, the party with the burden loses. Cf. Williams v. Head, 185 F.3d 1223, 1227-28 (11th Cir. 1999) (where due to the passage of time trial counsel who is charged with rendering ineffective assistance does not recall all that he did or many of his thought processes relating to the trial, we will presume that counsel did what he should have done and that he exercised reasonable professional judgment). Or at least it is not unreasonable – which is the standard we are applying – for the state court to conclude that the burden-bearing party loses.

The state habeas court reasoned that "[i]n light of the record in this case it is just as reasonable to assume that ten years ago Mr. Thomas had a reason for acting as he did as it is to assume that in the absence of any explanation that the failure to impeach a certain witness was error. Petitioner has the burden of proof and has failed to carry it ...." Whether we view that as a factfinding or a conclusion of law, or a little of both, it is reasonable. As the district court explained, "this court considers it unlikely Mr. Thomas' minimal prior representation of Ms. Romine infected his strategy on cross examination when Mr. Thomas was prepared to impeach her with certified copies of her convictions and retained the option of recalling Ms. Romine to impeach her but ultimately decided not to do so."

The state habeas court's decision that Thomas' prior representation of Ms. Romine was not an actual conflict of interest that adversely affected his representation of Romine is not contrary to, and does not involve an unreasonable application of, <u>Cuyler</u> or <u>Burger</u> or any other Supreme Court decision.

## B.  THE STATE'S EXTENSIVE RELIANCE UPON BIBLICAL AUTHORITY IN ITS CLOSING ARGUMENT AT THE RESENTENCING TRIAL

Religion permeated virtually every aspect of the resentencing trial.  There was extensive evidence about religion and its connection to the case that was properly admitted because it related to the crime and to Romine's character and behavior, and was therefore relevant to the issues before the jury.  For example, there was testimony about Romine's religious upbringing and his subsequent rejection of Christian values.  The jury learned how Romine's parents were deeply religious people who had raised him in strict accordance with the tenets of their Christian faith.  Testimony described how he and Diane Romine had been very active in local church activities at the beginning of their marriage, how they performed in a gospel singing group, and about Romine having preached at several churches in the area.  Evidence linked Romine's rejection of Christian values to his descent into adultery, drug use, and murder.  Indeed, Romine himself testified that his misbehavior was attributable to the "devil's doings."

14

The problem is not the testimony about religion as it related to how Romine came to be in the dock at the resentencing trial. The problem is the prosecutor argued Biblical law to the jury as a basis for urging it to eschew any consideration of mercy and sentence Romine to death, and that argument came against a background of circumstances that aggravated the error. During the presentation of evidence, Romine's grandfather (the father of one victim and father-in-law of the other) appeared as a witness on behalf of Romine. The prosecutor cross-examined him about scripture, asking him whether he believed in the New Testament verse that commanded "honor your mother and father or be put to death."[7] That alone

---

[7] That part of the cross-examination went as follows:

Q      And as far as being against the death penalty, you wouldn't want anybody to be electrocuted?

A      No sir.

Q      Not even somebody that commits the worst and most horrible murder you can possibly imagine?

A      No siree.

Q      You'd automatically vote against the death penalty?

A      Ever since I've been saved, which is forty some odd years ago.

Q      What about before you were saved, would you have ... ?

A      Well, really, I was just a lost man and I didn't really think about it or didn't care just to tell you the truth about it. But after I got saved and began to follow the words of the Bible and so on and so forth ....

15

would not have been constitutionally problematic, but there was more.

After a lengthy voir dire session, the presentation of evidence took a week, and during that time the jury was sequestered. The jurors were not sequestered and lodged in a hotel or motel, but in the Baptist Assembly in Burnt Mountain, Georgia.[8] When the time came to recess the trial on Saturday night, the judge

Q     Do you feel there's no Biblical basis for the death penalty?

A     Well, I couldn't say. I don't have no education on that, as far as reading the Bible and if I can't get it read to me why I ain't gonna say nothing.

Q   Do you believe in the fifth commandment about honoring your mother and father?

A     I don't believe I heard you.

Q     Uh, you know the fifth commandment that says honor your mother and your father?

A     Oh yes sir, I remember that one.

Q     Do you know in Matthew, the New Testament, it says honor your mother or father or be put to death? Are you familiar with that?

A     Uh-huh.

Q     No further questions.

The prosecutor did not cite the chapter and verse then, but he was obviously referring to Matthew 15:4: "For God said, 'Honor your father and mother,' and 'Anyone who curses his father or mother must be put to death.'" (New International Version).

The prosecutor would come back to that verse during closing argument.

[8] Apparently, those were the best accommodations available in the area.

16

explained to the jurors that he and the attorneys were tired, and that he was not going to hold court on Sunday. He apologized for the imposition, since the jurors were sequestered. The judge explained that it would not be a good idea for the jurors to go out to church because people might want to come up and talk with them. He then told the jurors:

> Uh, let me ask this, will it be a problem for you all if you do not go tomorrow, or maybe get Brother Caylor out there, if he hasn't got something lined up, he might put you in a room and give you a good sermon, as long as he don't get on matters, uh, concerning this.
>
> But, uh, we can make sure you've got your Bibles and maybe some, maybe some television, uh, some of them I think have asked for television. I told them it would be alright to have your television out there for some of you. And it might be it could be put up in a room where more than, you know, several of you could get there. And, uh, you might even be able to pick up that Falcon game tonight at 7:30, gentlemen, and you ladies that like football.
>
> But, nevertheless, if you can, see if you can attend church in the sense that you either read your own Bible or either watch it on television tomorrow morning. I realize that's probably not in keeping with some of your practices. But, uh, we do have – these men have been working hard to get the case ready, both sides. It's a difficult type case to get ready and they do need to do more work from the standpoint of helping get charges ready to go over, what they need to do in their closing arguments and things of that nature and they need some time. It's very difficult for them to be on trial all day long, then go home at night and try to get something else prepared. It is for me too.

After admonishing the jurors not to discuss the case, the court sent them to their

17

Baptist Assembly quarters until 9:00 a.m. Monday morning.  The record does not reveal whether Brother Caylor put the jurors in a room and gave them "a good sermon" as the judge had suggested.

Two days after the jury returned to court, the case was ready for closing argument.  The prosecution opened the arguments, to be followed by the defense. There was to be no rebuttal argument.  See O.C.G.A. § 17-10-2; Beck v. State, 326 S.E.2d 465, 469 (Ga. 1985).  Towards the end of his argument the prosecutor held up crime scene photographs of the interior of the house in which Romine murdered his parents, and told the jury:

> I apologize for showing those pictures again, but you need to see that and realize what's there.  This is the debris we're talking about. [Romine] spattered his mother's living tissue, her heart still throbbing, pumping, ... [and] sprays it all over that picture of the Last Supper of Christ sitting with the disciples.  You know, this home, this home that he'd grown up in where Christian values were preached and taught and that's the only – that's the reason he shot them, one of the reasons, that they were too strict ....

That argument, although graphic, was related to exhibits in evidence.

What came a page later was not.  That is where the prosecutor wrapped up his argument with a rousing call for the jury to sentence Romine to death, after prayer if need be, because the Bible required that result:

> I ask you, ladies and gentlemen, to go out there and render a verdict that speaks the truth, and that is one that complies not only with the law of man, the law of God and when the counsel

18

asks you ... whether there is a Biblical basis for the death penalty and about turning the other cheek, uh, I want to submit to you Matthew 15 verse 4. And this, you know, this is New Testament stuff. That's where it says turn the other cheek too. "For God said, respect your father and your mother. And whoever curses his father or his mother is to be put to death." Now, curses, it's a – interpret the Greek word for curses, in the amplified version it goes beyond curses and it says abuses or treats improperly. And, uh, in Exodus 21:15, anyone who hits his mother or father should be put to death. So all of those things, hit, harm, abuses, mistreats, shall be put to death.

And, uh, there's nowhere in the New Testament where it eradicates the law. The Lord came to fulfill the law, not to change it or abolish it.

If you go all the way back, if you go all the way back to ... [the] Fifth Commandment, it's the first commandment that has a promise to it. And that is that you honor your mother and father. You respect them, in order that your days may be long upon this earth. And if you violate that, you subject yourself to the possibility of not living as long as you might have lived. And I submit to you that the penalty should fit the crime. According to whether you curse your father, hit your father, abuse your mother, mistreat her, or shoot her in the chest from four feet away.

Leviticus 20 verse 9, the Lord gave the following regulation: "Anyone who curses his father or his mother shall be put to death." He is responsible for his own death.

So when counsel gets up here and tells you that you are pulling the switch in a case that if you wait five or ten years, there might be new evidence, uh, he's responsible for his own death. He killed his parents, I submit to you. You're not pulling the switch. You're just carrying out your duty. You took an oath to abide by that duty. Life for life, bone for bone, eye for eye.

19

And, uh, we just submit to you folks that there is a Biblical basis for all our laws.  It's there.  You can trace it back.  For those of you, no matter how you've answered the question on voir dire, don't worry about it because if you want to – by the way I point out that I may have been out of the courtroom at the time, but I don't know that we opened, uh, court with prayer and pledge of allegiance but I submit to you, suggest to you, that perhaps that would be a – I don't know that that's appropriate, but the suggestion is there.  You may want to pray about that and be sure you're doing the right thing and ask for some guidance.

Because you don't ignore totally what's in this book just because we're asking you to be the judge of the law and the facts because you take that common sense with you back there.  And the judge will tell you, you know, what is a reasonable doubt.  And he will explain to you it's an honest, fair-minded juror honestly seeking the truth.

You know, and in about the next sentence it uses the word common sense and that's what we want you to use is your common sense.

And the State is asking for a verdict that speaks the truth in this case and that's the death penalty.

With that, the prosecutor sat down.  Defense counsel followed with a closing

argument that quoted no scripture and did not argue religion at all.[9]     During its

---

[9]  The closest defense counsel came to discussing religion was the last three sentences of his lengthy argument. There, after referring to the possibility of the jurors listening to the news someday and hearing about Romine's electrocution, he said:

I want you to be able to listen to that and as the smoke from that body rises up to an almighty God, say  "I knew to an absolute moral certainty that Ginger didn't lie, that Larry had to die."

instructions, the court told the jury that "whatever penalty is to be imposed, within the limitations of the law as I have instructed you, is a matter solely for you members of the jury to determine," and that "you are the judges of both the law and facts in this case." [10] Both the prosecutor and defense counsel during their closing arguments had told the jury that same thing: the jurors were the judges of both law and fact.

The prosecutor's admonition to the jurors to base their decision on whether

---

> If you can't do that, give him a life sentence and let him serve his God as best he can. I pray you'll understand.

[10] The court did tell the jurors not to consider the closing arguments as evidence. Immediately before the state prosecutor gave his closing argument, the court told the jurors:

> I caution you again that closing arguments as well as opening arguments are not evidence in this case.... You can accept in whole or in part the arguments of either of the attorneys or you can reject it entirely. Again, they're not evidence, but they are merely telling you what they think the evidence is and what inferences may be drawn from it. If that conforms to what you found the evidence to be in your inferences then that's fine. If it doesn't, then you may reject it.

The state prosecutor repeated this caution at the beginning of his closing argument:

> Ladies and gentlemen of the jury, as the court has instructed you anything I may say in these closing remarks is not evidence and anything that [the defense counsel] may say is not evidence ....

In addition, the court also instructed the jury at the beginning of the resentencing trial and after closing arguments to "only consider the evidence which has been introduced during this trial," and that evidence "does not include the indictment or the opening statements or closing arguments by the attorneys."

Romine should live or die on Biblical law struck home with at least some of the jurors. Linda Judkins, one of the jurors, testified at the state habeas proceeding that, immediately after the jury began its deliberations, she and another juror discussed one of the Biblical passages that the prosecutor had urged them to consider.[11] Although Ms. Judkins could not recall all of the details of that conversation, she did remember it concerned the interpretation of a Biblical passage about the proper punishment for patricide, and that during the discussion the other juror had asked her "how I could not see that this was what the Bible says you do with people who kill their parents." She also remembered that the discussion was prompted by the prosecutor's reference to the Biblical passage in his closing argument.[12]

The jury deliberated in the courtroom, because the jury room was too cramped to hold comfortably all the evidence and jurors. Ms. Judkins testified that, during the morning of the second day of deliberations, she noticed in the

---

[11] Ms. Judkins never specified which juror she had this discussion with, but in another part of her testimony she revealed that she had discussed a Biblical passage with the juror she roomed with during the sequestration. Whether that discussion was the same one that occurred at the beginning of deliberations or was another one is unclear.

[12] The State has not argued to us that any of Ms. Judkins' testimony should not be considered because of Federal Rule of Evidence 606(b) or any related doctrine, and we imply no view on that issue. In the absence of any such argument by the State, we do consider Ms. Judkin's testimony about her discussion with the other juror or jurors, as well as her testimony about consulting the Bible during deliberations. See also n.20, infra.

22

courtroom a Bible that had been used to swear in witnesses.  She got the Bible and looked up a passage.  The reason she did that, as she later explained, was:

> [T]he closing statement of one of the attorneys ... quoted a passage of scripture and it just didn't sound right to me.  It sounded like it had been quoted out of context or something was wrong with it and I just was curious about what it was that was bothering me about it.  And I had written down little pieces of the scripture that was quoted thinking that after the case was over I would go home and look it up and figure out what it was that disturbed me about it.

(As we have previously explained, the prosecutor was the only one who quoted the Bible during closing argument.)  When she testified about it, Ms. Judkins could not recall which passage she had looked up during deliberations, or whether she had discussed that passage with any other jurors.  She testified:

> I really don't think I even said anything to anybody about it.  Later on, I may have mentioned to the juror that I ... roomed with, because I know she was interested in Biblical passages and we had talked about [the] Bible verse that the lawyer used.  I don't recall that I really said anything about it in the courtroom, but I may be wrong, I may have.  That was a long time ago.

On the first day the jury got the case, after about three-and-a-half  hours of deliberations, the foreman reported to the court that "[w]e have a pretty wide division on it right now and the consensus of most everybody here is ... that they don't believe they can make a decision on it, about it."   The judge sent the jury to supper, and after it returned there were less than two hours more deliberation

23

before the evening recess. Within an hour after beginning deliberations again on the second day, the jury sent the judge a note stating: "We are unable to reach a unanimous decision and are certain we will not ever be able to reach one." The foreman reported that the division was eleven to one, although he did not say which way. Those events prompted a defense motion for a mistrial, which under Georgia law would have meant a life sentence, Hill v. State, 301 S.E.2d 269, 270 (Ga. 1983); the court denied the motion. Within an hour of resuming deliberations, the jury was back with a question about mitigating circumstances; the court recharged it on the subject. After the jury deliberated three or four more hours, the court called the jury back and gave it an Allen charge, and denied another defense motion for a mistrial. Following a couple more hours of deliberations, the jury returned with its unanimous verdict sentencing Romine to death. The court imposed that sentence as its judgment.

In his direct appeal from the resentencing judgment, Romine contended that the prosecutor's closing argument violated the Due Process Clause, a contention that focused on, among other things, the prosecutor's use of Biblical authority and his urging that a death sentence was necessary to comply with the law of God. The Georgia Supreme Court's disposition of that issue, in its entirety, was as follows:

24

On appeal, Romine for the first time complains of additional portions of the prosecutor's closing argument. Having examined the state's argument in its entirety, we conclude that nowhere did the prosecutor seriously overstep his bounds. We find no reversible error. See Davis v. State, 255 Ga. 598(16), 340 S.E.2d 869; Cook v. State, 255 Ga. 565(12C), 340 S.E.2d 843 (1986); Ford v. State, 255 Ga. 81(8i), 335 S.E.2d 567 (1985); Walker v. State, 254 Ga. 149(14), 327 S.E.2d 475 (1985); Spivey v. State, supra, 253 Ga. 187(4), 319 S.E.2d 420.

Romine v. State, 350 S.E.2d 446, 456 (Ga. 1986).[13] The state habeas court declined to rule on the issue because the Georgia Supreme Court already had rejected it. See Gunter v.Hickman, 348 S.E.2d 644, 645 (Ga. 1986) (issue raised and decided on direct appeal may not be re-litigated in state habeas proceeding).

The federal district court noted that Romine had failed to preserve the closing argument issue at trial, but held that there was no procedural bar because the Georgia Supreme Court had decided it on the merits. The district court also held that independent de novo review was required because the Georgia Supreme Court had "failed to address or apply the correct legal principles of federal law in its decision." But then the district court seemed to be referencing § 2254(d), by commenting that under AEDPA "this court can only grant relief if the state court

---

[13] The Georgia Supreme Court's language about "additional portions of the prosecutor's closing argument" was a reference to contentions discussed in an earlier part of its opinion that elsewhere in his closing argument the prosecutor had violated Georgia law by referring to the possibility that if Romine were sentenced to life he might be released some day. Romine, 350 S.E.2d at 456. About that issue, the Court said that it "views the prosecutor's argument with disfavor, but we hold that it does not sink to the level of reversible error." Id.

25

decision contravenes clearly established federal law as set forth by the Supreme

Court. 28 U.S.C. § 2254(d)(1)." Whatever the effect of that comment, the district

court did finally perform de novo review, concluding: "Regarding the prosecutor's

exhortation from the Bible, however, the court finds those comments clearly

improper but [they] do not rise to the level of a due process violation."

We begin our analysis of this issue by noting that if there were any

procedural bar as to the Biblical reliance closing argument claim, the State has

waived it. The State did not assert a procedural bar to this specific claim in the

district court and has not argued one as to it in this Court.[14] See Gray v.

Netherland, 518 U.S. 152, 166, 116 S.Ct. 2074, 2082 (1996) ("If the

misrepresentation claim was addressed at some stage of federal proceedings, the

---

[14] The State did not argue to the district court, and has not argued to us, that the closing argument claim as it relates to use of Biblical authority (paragraph 216 of the amended petition) is procedurally barred. The State's brief to us does point out that the separate claim relating to the prosecutor beginning his closing argument by asking if court had been opened with prayer (paragraph 215 of the amended petition) is one the district court found was procedurally defaulted. State's Brief at 41. That matter is not without confusion, however, because while the amended petition and the answer to it, as well as the district court's order, all refer to the prosecutor beginning his argument by asking or wondering out loud if the court had opened with prayer, that statement actually did not occur at the beginning of the prosecutor's argument. It happened on the next to last page of his fifty-three page closing argument. In any event, even putting the separate claim about the prosecutor asking about prayer aside, as we will in order to avoid getting bogged down in the procedural bar issues relating to it, the prosecutor's extensive reliance upon Biblical authority comprises a claim that the State does not argue is procedurally barred from our consideration.

26

Commonwealth would have been obligated to raise procedural default as a defense, or lose the right to assert the defense thereafter.").

We turn now to the merits where our task involves determining whether the Georgia Supreme Court' s rejection of this claim was a decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In applying the "contrary to" prong of the § 2254(d)(1) test, we look to see whether the Georgia Supreme Court "applie[d] a rule that contradicts the governing law" set down in United States Supreme Court decisions, or arrived at a different result involving materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 1519-20 (2000). If so, we are "unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause." Id. at 406, 120 S.Ct. at 1520.

The Georgia Supreme Court's rejection of the Biblical law closing argument claim was not an instance of a state court arriving at a result different from that in a Supreme Court decision involving materially identical facts, because there are no Supreme Court decisions involving a closing argument and surrounding facts that are materially identical to those in this case.

27

There are, however, problems for the judgment on the second prong of the "contrary to" test, which requires that we determine whether the Georgia Supreme Court applied a rule that contradicts the governing law set down in United States Supreme Court decisions.  Id.  To begin with, it is far from clear what, if any, rule of federal law the Georgia Supreme Court applied.  Its entire three-sentence discussion of the issue simply finds "no reversible error" based upon the bare conclusion that "nowhere did the prosecutor seriously overstep his bounds." Romine, 350 S.E.2d at 456.  A string cite to five state court decisions are all the authority that is given.  Id.  To top things off, the State's brief tells us that "it is difficult to fault the state appellate court for not applying federal law in its decision," which clearly seems to concede that the Georgia Supreme Court did not apply federal law.[15]

_____

[15]  The entire statement as it appears in the State's brief is as follows:  "With all due respect, it is difficult to fault the state appellate court for not applying federal law in its decision when Petitioner cited none for the second challenged portion of argument and cited only Caldwell [v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633 (1985)] for the first challenged portion and whether it was applicable authority was not clear at that juncture." State's Brief at 44. The "first challenged portion" of the argument, it is clear from the context, is the part in which the prosecutor argued that the jury should impose the death penalty because it complied with the will of God as set out in the Bible. See State's Brief at 42 - 43. (The "second challenged portion" was the prosecutor's argument about the blood and tissue of Romine's mother being splattered on the painting of the Last Supper.)

We realize, of course, that the State's apparent concession that the Georgia Supreme Court did not apply federal law in deciding this claim is inconsistent with its failure to challenge the district court's holding that there is no procedural bar as to the claim because the state supreme court decided it on the merits. But nothing prevents the State from waiving any procedural bar defense it has, see Netherland, 518 U.S. at 166, 116 S.Ct. at 2082, or making any

28

Given all these factors, especially the State's concession, we have grave doubt that the Georgia Supreme Court applied federal law at all, let alone the governing law set down in Supreme Court decisions. Failure to apply that governing law (or the same rule in state law) is tantamount to applying a rule that contradicts governing law, for these purposes. And under Williams that means the federal habeas court "will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause." 529 U.S. at 405-06, 120 S.Ct. at 1519-20. In other words, when there is grave doubt about whether the state court applied the correct rule of governing federal law, § 2254(d)(1) does not apply. That is what we have here, so we proceed to decide the issue de novo, as the district court did.

The law relating to prosecutorial argument at the sentencing stage of a capital case has been settled in this circuit since four en banc decisions on the subject were released in Georgia cases 16 years ago. See Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985) (en banc), vacated on other grounds, 478 U.S. 1016, 106 S.Ct. 3325 (1986), reinstated, 809 F.2d 700 (1987) (en banc); Drake v. Kemp, 762 F.2d 1449 (11th Cir. 1985) (en banc); Tucker (William) v. Kemp, 762 F.2d 1480 (11th Cir. 1985)(en banc), vacated on other grounds, 474 U.S. 1001, 106 S.Ct. 1517

concessions it feels appropriate.

29

(1985), <u>extended and reinstated</u>, 802 F.3d 1293 (11th Cir. 1986) (en banc); <u>Tucker (Richard) v. Kemp</u>, 762 F.2d 1496 (11th Cir. 1985) (en banc). Under that well-settled law, habeas relief is due to be granted for improper prosecutorial argument at sentencing only where there has been a violation of due process, and that occurs if, but only if, the improper argument rendered the sentencing stage trial fundamentally unfair. See <u>Brooks</u>, 762 F.2d at 1400; <u>Drake</u>, 762 F.2d at 1458; <u>see also Spivey v. Head</u>, 207 F.3d 1263, 1275 (11th Cir. 2000). An improper prosecutorial argument has rendered a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, <u>Brooks</u>, 762 F.2d at 1401, which is to say that absent the argument the defendant would not have received a death sentence. A reasonable probability is one that is sufficient to undermine confidence in the outcome. <u>Id</u>. (citation omitted); <u>Drake</u>, 762 F.2d at 1458; <u>Spivey</u>, 207 F.3d at 1275-76.

The first step in analyzing any sentence stage prosecutorial argument is to determine if it is improper, because no matter how outcome-determinative it is a proper argument cannot render the proceedings fundamentally unfair and therefore cannot be the basis for a constitutional violation. <u>Brooks</u>, 762 F.2d at 1403 ("A permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be

unconstitutional."); Spivey, 207 F.3d at 1276 ("Proper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair.").

We have had only a few decisions involving prosecutorial sentence-stage argument employing Biblical authority. In Cunningham v. Zant, 928 F.2d 1006, 1019-20 (11th Cir. 1991), we recounted a number of closing remark improprieties the prosecutor had made, and included in that list his "numerous appeals to religious symbols and beliefs, at one point even drawing an analogy to Judas Iscariot." (footnote omitted). A closer fit to the present case is our observation in Cobb v. Wainwright, 609 F.2d 754, 755 n.2 (5th Cir. 1980), that: "In his zeal to obtain a death sentence, the prosecutor made several clearly objectionable, and objected to, remarks. For example, at one point in his argument, the prosecutor resorted to the Bible. He told the jury that under its teachings there was no reason to show the defendants mercy." That is exactly what the prosecutor used scripture to persuade the jury in this case: that mercy was out of the question for anyone who murdered his parents; that under the law of God death is the mandatory penalty for patricide. It was as though the prosecutor sought to overrule, as far as this jury was concerned, Roberts (Harry) v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993 (1977) (holding mandatory death penalty statute unconstitutional), Woodson v.

31

North Carolina, 428 U.S. 280, 96 S.Ct. 2978 (1976) (same), and Roberts

(Stanislaus) v. Louisana, 428 U.S. 325, 96 S.Ct. 3001 (1976) (same).

The prosecutor's misuse of scripture in this case is improper for the same reason it is improper for prosecutors to use the now-infamous Eberhart quotation, which we have condemned on at least seven occasions.  See Nelson  v. Nagle, 995 F.2d 1549, 1555-58 (11th Cir. 1993) (holding the use of the Eberhart quotation in sentence-stage closing argument  improper and citing six other decisions reaching the same conclusion).  Eberhart v. State, 47 Ga. 598 (1873), is a Reconstruction-era Georgia Supreme Court opinion in a capital murder case which contains a tirade against mercy.[16]  The opinion rails against "that sickly sentimentality that springs into action whenever a criminal is at length about to suffer for crime," complains that "[w]e have had too much of this mercy," which "is not true mercy," because "[i]t only looks to the criminal," and so forth.[17]  The Eberhart opinion was discovered by Georgia prosecutors in the post-Furman capital punishment era, and some of them delighted in quoting from it to juries during closing argument at the sentence stage of capital cases.  See Potts v. Zant, 734 F.2d 526, 535 (11th Cir.

---

[16]  The interesting historical context in which the Eberhart opinion was issued is discussed in Drake v. Kemp, 762 F.2d 1449, 1467-69 (11th Cir. 1985) (en banc) (Hill, J., concurring).

[17]  The longer quotations from Eberhart that prosecutors used can be found in  Nelson, 995 F.2d at 1556, and the other of our Eberhart issue decisions cited therein.

32

1984) ("The Eberhart court's florid denunciation of 'that sickly sentimentality' that prompts some citizens to oppose the death penalty appears to have made it a particular favorite of some Georgia prosecutors ...."), vacated on other grounds, 478 U.S. 1017, 106 S.Ct. 3388 (1986), reinstated, 864 F.2d 1512 (1987).[18]

Sometimes the prosecutors attributed the Eberhart quotation to "the Justice of the Supreme Court of Georgia," Drake, 762 F.2d at 1458;  sometimes to "one of our noted justices," Bowen  v. Kemp, 769 F.2d 672, 681 (11th Cir. 1985); sometimes to "a judge," Nelson, 995 F.2d at 1556; and sometimes to "a noted legal scholar from the 1800's," Wilson  v. Kemp, 777 F.2d 621, 623 (11th Cir. 1985).

Regardless of the source to which the prosecutors attributed it, however, we have always condemned use of the Eberhart quotation at the sentence stage of a capital case, describing it variously as "improper," Bowen, 769 F.2d at 681; "clearly improper," Potts, 734 F.2d at 536; "highly improper," Presnell  v. Zant, 959 F.2d 1524, 1529 (11th Cir. 1992); and "undeniably wrong," Drake, 762 F.2d at 1459.  The reason its use is improper, as we have explained, is that invoking the authority of a court, judge, or legal scholar to persuade the jury that mercy can have no place in a capital sentencing proceeding is undeniably wrong.  Drake, 762 F.2d at 1459; Wilson, 777 F.2d at 626 ("[W]hen the prosecutor argues that it is

_____

[18] Six of the seven Eberhart quotation cases that made it to our court were from Georgia, while the seventh, Nelson, was from Alabama.  We can only infer that the technique spread west.

33

mercy itself that is inappropriate, the jury is told that the concept of mercy – the most significant factor which might point toward a choice of life imprisonment – is illegitimate."); cf. Brooks, 762 F.2d at 1410 ("Because the jury is empowered to exercise its discretion in determining punishment, it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required.").

The Eberhart argument is wrong on the law, because mercy is acceptable in post-Furman capital sentencing regimes, and if anything, is particularly favored under Georgia's statute, which permits the jury in its unbridled discretion to impose a life sentence regardless of the number or strength of aggravating circumstances. See Drake, 762 F.2d at 1459 ("In the current Georgia capital punishment regime, the sentencing jury has complete discretion to choose between life imprisonment or death after the finding of one statutory aggravating circumstance."); Tucker, 762 F.2d at 1504 n.10 ("Once such a circumstance has been found, the jury has complete discretion to impose death or life imprisonment as a punishment.").  Telling a Georgia capital sentencing jury that the state supreme court, or a justice of it, or some judge or legal scholar has decided that they should not even  consider mercy misleads the jury about one of its central

34

tasks, which is to decide whether the individual, convicted murderer standing before it should receive mercy.

Likewise, a prosecutor misleads a capital sentencing jury when he quotes scripture as higher authority for the proposition that death should be mandatory for anyone who murders his parents. And that is what this prosecutor argued to the jury: In the Bible God said that anyone who kills his parents should be put to death, no "if's," "and's," or "but's" about it. That may or may not be Biblical law, but it is not post- Furman capital punishment law.

If, instead of quoting scripture, the prosecutor in this case had attributed the same pronouncements found in the scriptures he quoted to the Georgia Supreme Court or a justice or other noted legal authority, we know from our decisions dealing with the Eberhart quotation, that the argument would have been improper. It is no less improper to attribute the same abjuration of mercy to the higher authority of the Bible.[19] The possibility always exists that some jurors will be at least as impressed by Biblical authority as by the authority of a court or a legal scholar. Recall that two of the jurors who decided Romine's fate actually

---

[19]We have previously acknowledged in a capital case that "translating facts into a penalty is an ethical operation," see Brooks, 762 F.2d at 1407. In this case, we have no occasion to decide, and imply no view about, whether quoting scripture in closing argument in a capital sentence proceeding will always be improper. We decide only that the particular use to which scripture was put in this case was improper.

35

discussed the meaning and effect of one of the scriptures the prosecutor urged on them, and one juror consulted a Bible to make sure that the prosecutor had one of the Bible verses right. It mattered to her.

Because the prosecutor's extensive reliance upon anti-mercy scripture was improper in this case, we turn now to the second step of the legal analysis, which is to determine if the improper argument warrants habeas relief. Not all improper prosecutorial arguments require relief, because not all of them render the proceeding unfair, which is the measure of a due process violation. See Darden v. Wainwright, 477 U.S. 168, 179-81, 106 S.Ct. 2464, 2470-71 (1986) (relief not required merely because the argument "deserves the condemnation it has received from every court to review it"). A sentence proceeding is rendered unfair by an improper argument if, absent the argument, there is a reasonable probability that the result would not have been a death sentence, a reasonable probability being one which undermines our confidence in the outcome. See Spivey, 207 F.3d at 1275-76; Williams v. Kemp, 846 F.2d 1276, 1283 (11th Cir. 1988) ("[A]lthough we wholeheartedly condemn the prosecutor's remarks, we do not believe that these comments rendered Williams' sentencing proceeding fundamentally unfair."); Brooks, 762 F.2d at 1401; Tucker, 762 F.2d at 1504-05; Drake, 762 F.2d at 1458. In making this prejudice determination, "[o]f primary importance is the need to

36

examine the entire context of the judicial proceeding." Brooks, 762 F.2d at 1400; accord, Cargill v. Turpin, 120 F.3d 1366, 1382 (11th Cir. 1997) ("after a thorough review of the full context of the sentence proceeding ..."); Gates v Zant, 863 F.2d 1492, 1503 (11th Cir. 1989) ("Considering the totality of the circumstances ....").

The circumstances here include a sentence stage trial saturated with evidence relating to religion, in which the jurors are sequestered at a Baptist assembly, where the judge suggested having "Brother Caylor out there" put the jurors in a room and "give you a good sermon."[20] Then the prosecutor in his closing argument gave the jurors a hell fire and brimstone mini-sermon the effect of which was to tell them that regardless of the law of Georgia, they ought to follow the law of God, as the prosecutor interpreted it to rule out any consideration of mercy.

"[I]solated, or ambiguous or unintentional remarks must be viewed with lenity," Brooks, 762 F.2d at 1400, and a brief remark is less likely to cause prejudice. Id. at 1415. However, there was nothing ambiguous or unintentional

---

[20]  Romine presented as a separate claim for relief the juror consulting a Bible during deliberations, and may have presented as a separate claim the lodging of the jurors at the Baptist Assembly. The district court found those claims were procedurally barred from consideration, the state has argued that bar to us, and we do not dishonor it.  Our decision that relief should be granted is not based on either of those claims. We do, however, consider the facts  underlying them as part of the totality of the circumstances that we must consider now that we have reached the prejudice prong of the prosecutorial argument claim.  There is no requirement that a defendant object to every circumstance relevant to the determination of whether there was prejudice from an error contained in a claim for which there was no procedural default (or, as with this closing argument claim in the present case, a claim for which any procedural default has been waived).

about the prosecutor's improper argument in this case, and it was more than a brief remark. Instead of being "fairly isolated within the body of the prosecutor's argument," Bowen, 769 F.2d at 681-82, these improper remarks were strategically placed at the end. It can make a difference if the improper argument was preceded by remarks of defense counsel which invited it, see Darden, 477 U.S. at 179, 106 S.Ct. at 2470, or if it was followed by defense argument which ameliorated the error, see id. at 182, 106 S.Ct. at 2472; Cargill, 120 F.3d at 1379; Gates, 863 F.2d at 1503; Tucker (William), 762 F.2d at 1488. Here there was no invitation – defense counsel had not even argued at that time – nor was there any responsive argument that adequately ameliorated the effect of it.

An on-the-spot curative instruction from the court can make a difference, or failing that, improper argument can sometimes be remedied by the final instructions to the jury. Cargill, 120 F.3d at 1379; Brooks, 762 F.2d at 1400. There was no curative instruction from the court at the time of the argument, and the final instructions to the jury did not effectively cure the error, either. The court and both counsel did tell the jury that closing arguments were not evidence, but that did not help because the problem with this improper argument is not that it misstated the evidence, but that it misstated the law. The court's instructions to the jury, as well as both sides' arguments, stressed that the jurors were the judges of the law as well

38

as the evidence. That did not help, either; instead, it may have hurt by leading some jurors to believe that they could substitute the Biblical law urged upon them by the prosecutor for the law of Georgia.

In most cases we are left to speculate about what effect, if any, closing argument may have had on the jury, but here we know that this improper argument led at least two members of the jury into a discussion about its content, a discussion in which one of them argued to the other the precise point of the improper argument. And we know that a juror cared enough about the argument to check one of the scriptures that the prosecutor had used in order to ensure that he had quoted it correctly.

Of course, the relative strength of the aggravating and mitigating circumstances is an important factor to be considered in deciding whether there is a reasonable probability that but for the improper argument the result might have been different. See Cargill, 120 F.3d at 1379; Brooks, 762 F.2d at 1415-16; Tucker (Richard), 762 F.2d at 1509. One ready measure of that in this case is the fact that the jury in this case was initially deadlocked on whether the sentence should be life or death. The foreman initially told the judge that there was a wide division and the jurors did not believe they could reach a decision, which under Georgia law would have resulted in a life sentence. See Hill v. State, 301 S.E.2d

39

269, 270 (Ga. 1983). After an overnight recess and further deliberations, the jury sent the court a note announcing with certainty that it would never be able to reach a unanimous decision. Only after the court gave the jurors an Allen charge did they finally reach a verdict. The difficulty the jury had in reaching a verdict, especially when coupled with the evidence that one or more jurors were affected by the improper argument, weighs in favor of concluding that there is a reasonable probability that argument may have affected the result.

The primary factor weighing against a finding that the improper argument rendered the sentencing proceeding unfair is the lack of any contemporaneous objection to it. See Cargill, 120 F.3d at 1379; Williams, 846 F.2d at 1283 ("[T]hat no objection was made during the prosecutor's closing argument further supports our belief that the statement was not severe enough to render the sentencing hearing fundamentally unfair."); Brooks, 762 F.2d at 1397 n.19 (the absence of an objection "may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging"). We have considered that, and given it weight, but the factors pointing in the other direction in this case outweigh the implications of counsel's failure to object. See Drake, 762 F.2d at 1460-61 & n.16 (relief due because of improper Eberhart quotation argument notwithstanding the absence of any contemporaneous objection to it).

40

We have previously described why the improper argument here is closely analogous to the Eberhart quotation argument which we have found to be improper all seven times we have considered it. The scripture-quoting argument in this case, like the Eberhart-quoting argument, strikes at the heart of one of a Georgia jury's most important roles in a capital sentence proceeding, which is to make an individualized determination of whether mercy should be afforded in a specific case to a particular defendant. In six of the seven cases in which this Court has considered the Eberhart quotation argument, we have decided that its use rendered the sentence proceeding unfair, concluding that it undermined our confidence in the result to such an extent that habeas relief was required. See Nelson, 995 F.2d at 1557-58. We reach the same conclusion here. In view of all of the facts and circumstances, the prosecutor's improper argument in this case undermines our confidence in the sentencing result to such an extent that habeas relief is required as to the sentence.[21]

---

[21]The circumstances of this case are unusual. We have no reason to decide, and do not mean to imply any view about, whether the same result would follow if, for example, the jurors had not been sequestered in a Baptist assembly and had not been told about getting a good sermon from Brother Caylor, or if the prosecutor's argument had come in reply to argument by the defense or had been responded to in kind by the defense, or if there had been a curative instruction, or if there had been no evidence that the argument had struck home with some jurors, or if the jury had not been initially deadlocked, or if the effect of a deadlock had been different under Georgia law, and so forth. We have decided this case, as we are required to do, based upon all of the specific facts and circumstances presented in it. See Cargill,120 F.3d at 1382; Gates, 863 F.2d at 1503; Brooks, 762 F.2d at 1400.

41

## CONCLUSION

The district court's judgment is AFFIRMED to the extent that it denies habeas relief as to the conviction, but it is REVERSED to the extent that it denies habeas relief as to the sentence. The case is REMANDED to the district court for further proceedings consistent with this opinion.